IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL MALL TOURS<br>OF WASHINGTON, INC.,<br>2640 Reed Street, N.W.,<br>Washington, D.C. 20018,<br><br>   Plaintiff,<br><br>   v.<br><br>SALLY JEWELL, *in her official capacity as*<br>Secretary of the Interior,<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR,<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>JONATHAN JARVIS, *in his official capacity as*<br>Director of the National Park Service,<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>and<br><br>NATIONAL PARK SERVICE,<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>   Defendants. | Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff National Mall Tours of Washington, Inc., ("National Mall Tours"), by and

through its undersigned attorney, complain of defendants as follows:

1

**INTRODUCTION**

1.      This Complaint concerns the illegal actions of the United States, acting through the

United States Department of the Interior and its underlying agency, the National Park Service

("NPS")(collectively referred to as "defendants" or "NPS"), arising from and related to NPS's

solicitation for and award of a non-procurement concession contract which authorized

interpretive transportation services on the National Mall and Memorial Parks in Washington,

DC.

2.      Prior to making an award of the concession contract at issue, NPS was aware that the

offeror which it had selected for award, City Sightseeing Washington D.C., Inc., dba Big Bus

Tours ("intended awardee"), had been purchased by a foreign-owned corporation after the date it

submitted its proposal, and therefore its controlling interest had changed.

3.      This pre-award change in the intended awardee's ownership and controlling interest

invalidated the critical certifications which the intended awardee had been required to submit to

NPS pursuant to the Prospectus.  This change in ownership also was directly relevant to other

key factors in the evaluation of the intended awardee's proposal, including the amount of control

the new owner exerted over the intended awardee, the background of the owner, including any

history of criminal or fraudulent conduct, as well as the intended awardee's financial ability to

actually perform the contract as promised after its purchase by the new owner.  NPS had the

legal authority to review this change in ownership of the intended awardee, but failed to do so.

This decision was arbitrary, capricious, not in accordance with law and an abuse of any

discretion the agency may have had in evaluating the proposals or awarding the contract.  Had

this important change in the intended awardee's ownership been taken into account by NPS, it

would have had a substantial detrimental impact on the evaluation of the intended awardee qualifications, resulting in NPS selecting National Mall Tours.

4.      In addition, NPS violated explicit statutory obligations set out in 16 U.S.C. § 5952(6) by failing to submit its preliminary award decision and the proposed concession contract to the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate for a 60 day review period.  Section 5952(6) of 16 U.S.C. requires this review for any proposed NPS concession contract which has anticipated annual gross receipts in excess of $5,000,000.  The historical gross revenues of substantially similar operations as those authorized by the new concession contract were $8,100,000.  In addition, National Mall Tours estimated that the annual gross revenues would be even higher ($8,500,000).  Further, based on information and belief, the intended awardee also estimated annual gross revenues in excess of $8,000,000.  Therefore, there was no reasonable basis for NPS to allege the revenues would somehow be almost half this amount and thereby evade a statutorily mandated review by the Congressional committees.  NPS's improper effort to avoid this procedural safeguard in the solicitation process caused harm to National Mall Tours because, based on information and belief, this review process would have resulted in NPS reconsidering its selection and re-evaluating the proposals.

5.      Injunctive relief is clearly merited in this instance.  National Mall Tours informed NPS of the violations of law discussed above by email and letter on March 25 and 26, 2015 and requested that NPS hold off on any award of the contract until the issues could be evaluated and a debriefing provided.  In addition, National Mall Tours inquired as to whether NPS had awarded the contract at issue at that point, and NPS stated that it had not made any award.  NPS then responded on March 26, 2015 and informed National Mall Tours that it was reviewing National

Mall Tour's information and request and would respond "as soon as possible." NPS also stated

that it was preparing National Mall Tours' debriefing.

6.      On April 1, 2015, because NPS had not responded or provided a debriefing, counsel for

National Mall Tours again contacted NPS to inquire about the status of its promised response.

Two days later, on April 3, 2015, NPS informed National Mall Tours that NPS had, without

providing advance notice, gone ahead and awarded the contract at issue to its intended awardee.

NPS never provided any debriefing before moving forward with the award of the contract.  NPS

also admitted that it knew its award decision would likely be subject to litigation and referred all

further communications to its attorneys.  Therefore, because NPS clearly awarded the contract

even though it was aware of the likelihood of impending litigation, it cannot now legitimately

claim that a post-award challenge to its decision creates unfair prejudice to it or the intended

awardee.

7.      In addition, because the intended awardee has been providing the services at issue to the

public pursuant to a short-term temporary contract and can continue to provide such services

pursuant to a short-term authorization with similar terms, there is no compelling need to

immediately issue the long-term contract to the intended awardee.  NPS cannot assert that it must

have a long-term contract in place now because that assertion would show that NPS intended all

along to award the contract to its incumbent.  NPS knew that it would make a decision regarding

the contract in March, and had NPS selected anyone other than the incumbent, that offeror would

have needed time to obtain the property, hire employees and set up operations and would not

have been able to begin operating immediately.  Therefore, if NPS believed all along that it had

to have a long-term contract in effect shortly after its award announcement in March, NPS must

have planned all along to simply continue with the incumbent.  National Mall Tours has no

current basis to believe NPS had this plan, but instead that NPS knew that it could issue a

temporary contract if needed until a long-term contract and concessioner was in place.  A short-

term temporary contract would preserve the status quo and allow for the prompt resolution of

this matter.

**JURISDICTION AND VENUE**

8.     The claims asserted herein arise under the Administrative Procedure Act, 5 U.S.C. §§ 500

*et seq.*, the National Park Service Concessions Management Improvement Act of 1998, 16

U.S.C. § 5951 *et seq.* and its implementing regulations set out at 36 C.F.R. Part 51.  This Court

has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and may issue

the requested relief pursuant to 28 U.S.C. § 2201 (declaratory relief) and 28 U.S.C. § 2202

(injunctive relief).

9.     The defendants have waived sovereign immunity for the actions at issue pursuant to 5

U.S.C. § 702 because the claims, which do not involve procurements, are not for money

damages, an adequate remedy for the claims is not available elsewhere and the claims do not

seek any relief expressly or impliedly forbidden by another statute.  Moreover, the repeal of

district court jurisdiction in the Administrative Dispute Resolution Act ("ADRA"), Pub.L. No.

104–320, § 12, 110 Stat. 3870, 3874–76 (1996) over any action related to a procurement contract

award determination did not eliminate the district courts' longstanding jurisdiction over

government actions related to the award of contracts which do not involve procurements.  *See*

*Resource Conservation Group, LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir.

2010)("Admittedly, dividing jurisdiction between the Court of Federal Claims and the district

courts for non-procurement bid protests may lead to similar problems that led to the enactment of

1491(b)(1). However, if the statute is to be amended to solve this problem, that amendment must be undertaken by Congress and not this court").

10.     National Mall Tours also has standing to bring these claims.  Defendants' determination to award the contract at issue to the intended awardee has caused National Mall Tours concrete, present and continuing injury by denying National Mall Tours the benefits of the contract at issue to which it is legally entitled.  Defendants' conduct has also caused harm to National Mall Tours' viability as well as its long-term growth plans.  In addition, NPS's violation of legally-mandated procedures also provides National Mall Tours with standing.

11.     Defendants' actions are ripe for judicial review under Article III, Section 2 of the U.S. Constitution, and reviewable as final agency action under 5 U.S.C. § 704 because, NPS has made a decision to, and has awarded, the contract at issue.  In addition, the award of the contract determines legal rights and obligations by setting forth particular contract obligations, authorizations, duties and benefits.  Withholding judicial review will cause direct and immediate hardship to National Mall Tours for which money damages would be inadequate, even if they were available, but in fact no money damages are available given that NPS did not award the contracts to National Mall Tours.  This fact precludes National Mall Tours from bringing any claim arising under those contracts.  Withholding judicial review will also permit defendants to successfully, deliberately and wrongfully violate explicit federal statutes and regulations, which is contrary to the public interest.  *See Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C. Cir. 1970)(ensuring that agencies follow the regulations which control government contracting is in satisfy the public interest).  National Mall Tours has no other administrative procedure available to it to pursue, and has fully exhausted all possible remedies, both formal and informal.

6

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and 1391(e) because the final decisions at issue here were made by NPS officials located in Washington, DC on behalf of the Director of the National Park Service, who is also located in Washington, D.C.

## PARTIES

13.     Plaintiff National Mall Tours is as a corporation organized under the laws of the District of Columbia, with its principal place of business at 2640 Reed Street, Washington, DC 20018.

14.     Defendant is the Department of the Interior acting through the NPS.  NPS is an agency of the Department of the Interior, with its headquarters located at 1849 C Street NW, Washington, DC 20240.  Director Jon Jarvis's office is also located at that address.  The Department of the Interior has its headquarters at the same address, which is where Secretary Sally Jewell's office is located.

## STATEMENT OF LAW AND FACTS

### Background

15.     This suit arises out of NPS's actions following its issuance of a solicitation for proposals to enter into a non-procurement contract to provide interpretive transportation services to the public at the National Mall and Memorial Parks in Washington, DC, and the subsequent decision to make an illegal award of that contract to NPS's incumbent concession contractor, rather than to National Mall Tours.

16.     National Mall Tours was established as a corporate entity in Washington, D.C., for purposes of submitting a proposal in response to the solicitation at issue.  National Mall Tours is wholly owned by Old Town Trolley Tours of Washington, Inc., which is local to Washington, D.C.  Old Town Trolley Tours of Washington, Inc. also owns Arlington National Cemetery Tours, Inc., another Washington, D.C. company, which was recently awarded a long-term

contract for providing interpretive tours of Arlington National Cemetery.  Old Town Trolley

Tours of Washington, Inc. is wholly owned by Historic Tours of America, Inc. with headquarters

in Key West, Florida.

17.    The entities owned by Historic Tours of America, Inc. serve approximately 2.5 million

guests each year and have an excellent record of providing very high quality transportation and

interpretive services to the public.

*Issuance of the Prospectus*

18.    On October 23, 2014, NPS put out a notice that it was issuing a Prospectus soliciting

proposals for interpretive transportation services at the National Mall and Memorial Parks in

Washington, DC.

19.    The Prospectus stated:

> National Mall and Memorial Parks is responsible for more than 1,000 acres of
> parkland containing many of the United States' most significant natural and
> cultural resources. The sites of the National Mall and Memorial Parks are symbols
> of our nation, known worldwide and depicted on everything from currency to the
> nightly news. Located in the core of the Nation's Capital, National Mall and
> Memorial Parks administers, interprets, maintains and preserves the Washington
> Monument, Thomas Jefferson Memorial, Lincoln Memorial, Franklin Delano
> Roosevelt Memorial, D.C. War Memorial, World War II Memorial, Korean
> Veterans Memorial, Vietnam Veterans Memorial, George Mason Memorial,
> Pennsylvania Avenue from the Capitol to the White House, the National Mall,
> East and West Potomac Parks, Constitution Gardens, 60 statues, and numerous
> other historic sites, memorials, and parklands.

> National Mall and Memorial Parks' origins are as old as the capital city itself. The
> open spaces and parklands envisioned by Pierre L'Enfant's plan, commissioned
> by President George Washington, created an ideal stage for national expressions
> of remembrance, observance, celebration, and expression of First Amendment
> rights. Numerous First Amendment activities and special events occur in the Park
> each year.

> The National Mall and Memorial Parks offers Americans the opportunity to get in
> touch with their heritage. Thousands of schoolchildren, families, foreign visitors,
> veterans, and recreational users come to the Park daily. They take advantage of

interpretive programming presented by Park Rangers, Park exhibits, publications, orientation services, and panoramic views from the Washington Monument.

Prospectus (Business Opportunity at Page 5).

20.     The draft contract issued with the Prospectus stated that the concessioner would be required to provide interpretive visitor transportation services and the location of the services was "[a]pproximately nineteen stops within the National Mall, from the National Mall to Columbus Plaza at Union Station via the U.S. Capitol, Pennsylvania Ave. at the Willard Hotel, and to the transfer station at Arlington Cemetery."  Prospectus (Draft Contract at Page 1, Sec. 2(a)(1)).

21.     The Prospectus also stated that the annual "estimated historical gross revenue" related to the operations under the new contract was $8,100,000.  Prospectus (Business Opportunity at Page 1).[1]  The Prospectus stated that NPS "has estimated the revenue based upon the total estimated tour ridership within the Park."  *Id.*

22.     National Mall Tours estimated that the annual gross revenues for the first year of the contract would be $8,580,000.

23.     The National Park Service Concessions Management Improvement Act of 1998 requires NPS to submit any proposed contract with anticipated annual gross revenues in excess of $5,000,000 for review to Congressional committees before awarding the contract:

> Congressional notification.—The Secretary shall submit any proposed concessions contract with anticipated annual gross receipts in excess of $5,000,000 or a duration of more than 10 years to the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate. The Secretary shall not award any such proposed contract until at least 60 days subsequent to the notification of both committees.

---

[1] The operations continued up through the release of the Prospectus in October of 2014, but NPS, for unknown reasons, only provided revenue data for the period of May 1, 2012 through April 30, 2013.  Prospectus (Business Opportunity at 1).

16 U.S.C. § 5952(6).

24.     Based on the "estimated historical gross revenue" as set forth in the Business Opportunity

section of the Prospectus and the fact that the concession contract will have a 10-year term, the

total gross revenue for the entire contract term will be approximately $81,000,000.

25.     In the portion of the Prospectus entitled Proposal Instructions, NPS stated:

> Concession contracts issued for a term of more than ten years, or when the annual
> gross receipts are anticipated to exceed $5,000,000, are required by law [16
> U.S.C. § 5952(6)] to be submitted to the Congress for sixty days before they may
> be awarded. The new concession contract will not be submitted to the Congress
> because annual gross receipts are not anticipated to exceed $5,000,000 and the
> term will not be for more than 10 years.

26.     NPS did not set forth any financial analysis that supported its assertion that it anticipated

annual gross revenue under the new contract to be less than or equal to $5,000,000.

27.     NPS stated that it did not disclose its actual estimate of annual gross revenues in the

Prospectus because it was not confident in that estimate and did not want anyone to rely upon it.

*Requirements of the Prospectus*

28.     The Prospectus was subject to the terms of the National Park Service Concessions

Management Improvement Act of 1998, 16 U.S.C. § 5951 *et seq*. ("NPS Concessions

Management Improvement Act"), and its implementing regulations at 36 C.F.R. Part 51.

29.     The NPS Concessions Management Improvement Act requires NPS to pursue a

competitive selection process for awarding concession contracts by issuing a Prospectus.  16

U.S.C. § 5952(6).

30.     The Prospectus required each offeror to submit an "Offeror's Transmittal Letter," which

contained critical certifications regarding the past history of the offeror as well as any entity

having an ownership interest in the offeror.  The relevant sections of the required certification

letter are:

> The Offeror certifies that the information furnished herewith is complete, true, and correct, and recognizes that false statements may subject the Offeror to criminal penalties under 18 U.S.C. 1001. The Offeror agrees to meet all the minimum requirements of the Draft Contract and the Prospectus. The Offeror certifies that it has provided all of the mandatory information specified in the Prospectus.

> The Offeror certifies in accordance with 2 C.F.R. Part 1400 the following:

- None of the individuals or entities acting as Offeror or with an ownership interest in the Offeror is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from a public transaction by a federal department or agency.

- Within the three years preceding submission of the Proposal, none of the individuals or entities acting as Offeror or with an ownership interest in the Offeror has been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (federal, state or local) transaction or contract under a public transaction, or for violation of federal or state antitrust statutes or for commission of embezzlement, theft, forgery, bribery, falsification of records, making false statements, or receiving stolen property.

- None of the individuals or entities acting as Offeror or with an ownership interest in the Offeror is presently indicted for or otherwise criminally or civilly charged by a federal, state or local unit of the government with commission of any of the aforementioned offenses.

- The individuals or entities acting as Offeror or with an ownership interest in the Offeror have not had one or more public transactions (federal, state or local) terminated for cause or default within the three-year period preceding the submission of the Proposal.

- The individuals or entities seeking participation in this Concession Contract have not had one or more public transactions (federal, state or local) terminated for cause or default within the three-year period preceding the submission of the Proposal.

Prospectus (Proposal Package)(emphasis added).

31.     Pursuant to 36 C.F.R. § 51.17, the Prospectus also set out five principal selection factors,

all of which were critical to NPS's ability to effectively evaluate a proposal.

32.     Principal Selection Factor 3 involved an assessment of the offeror's "Organizational

Structure."  Prospectus (Proposal Package at Page 7).  Principal Selection Factor 3 was worth

between 0-5 points.  *Id*.

33.     Pursuant to Principal Selection Factor 3, all offerors were required to provide specific

information regarding any entities having a controlling interest in the offeror (Prospectus

(Proposal Package at Page 7)):

**Offeror's Organizational Structure**

> Describe the entity with which the National Park Service will contract, specifying whether it is currently in existence or is to be formed. Clearly define the Offeror's relationship to all superior and subordinate entities. Identify the entity, if other than the Offeror, that has the authority to allocate funds, hire and fire management employees of the Offeror. Identify any individual or business entity that holds or will hold a controlling interest in the Offeror.[2] If the Offeror is an unincorporated sole proprietorship, identify and provide information about the individual who owns and operates the business. If the Offeror is a limited liability company, a partnership, or a joint venture, identify and provide information about each managing member or manager, general partner or venturer, respectively.

---

[2] NPS defines "controlling interest in a concessioner" at 51 C.F.R. § 51.84, which states:

> A controlling interest in a concessioner means, in the case of corporate concessioners, an interest, beneficial or otherwise, of sufficient outstanding voting securities or capital of the concessioner or related entities that permits the exercise of managerial authority over the actions and operations of the concessioner. A "controlling interest" in a concessioner also means, in the case of corporate concessioners, an interest, beneficial or otherwise, of sufficient outstanding voting securities or capital of the concessioner or related entities to permit the election of a majority of the Board of Directors of the concessioner. The term "controlling interest" in a concessioner, in the instance of a partnership, limited partnership, joint venture, other business organization or individual entrepreneurship, means ownership or beneficial ownership of the assets of the concessioner that permits the exercise of managerial authority over the actions and operations of the concessioner.

<u>Submit your organizational documents</u> (e.g., partnership agreement, articles of incorporation, operating agreement).

Using the appropriate Business Organization Information form (as applicable) at the end of this section, identify the Offeror <u>and each business entity and/or individual to be involved in the management of the proposed concession operation</u>. Use the form appropriate for your business entity or sole proprietorship and <u>include all information necessary to make the relationship among the parties clear</u>. When completed, the Business Organization Information form should convey the following information:

1) Full legal name of the Offeror *and any trade name under which it proposes to do business*.

2) The legal form of the Offeror, if other than an individual.

3) <u>The name, address and, if applicable, form of business entity of all owner(s) of the Offeror</u>, including, without limitation, <u>all levels of parent organizations, their relationship to the Offeror, and the precise extent of their ownership interests</u>.

4) <u>The name, address and, if applicable, form of business entity of all</u> related, subordinate, or <u>superior business organizations and/or individuals that will have a significant role in managing, directing, operating, or otherwise carrying out the services to be provided by the Offeror</u>. Describe in detail how these relationships will work formally and in practice. Use additional pages if the information does not fit within the forms provided.

5) If applicable, the length of Offeror's existence as a business entity.

(Emphasis added.)

34.     Principal Selection Factor 4 involved an assessment of the offeror's financial capability to carry out its proposal.  Prospectus (Proposal Package at Page 12-13).  Principal Selection Factor was worth 0-5 points.

35.     Subfactor 4(a) of Principal Selection Factor 4 required each offeror to complete a Business History Information form:

Subfactor 4(a). Demonstrate that you have a credible, proven track record of meeting your financial obligations. The Offeror (or each Offeror-Guarantor) must provide comprehensive materials to demonstrate that it has a history of meeting its financial obligations by providing the following:

1)   The completed and certified Business History Information form provided at the end of this section. If the Offeror is not yet formed, include a Business History Information form for each Offeror-Guarantor.

36.   The required Business History Information Form specifically required information regarding the offeror as well as all parent companies.  The Business History Information Form is set out below:

Business History Information Form
(Principal Selection Factor 4- Subfactor 4A)

Business history information should be provided for the Offeror AND all parent companies. If the Offeror is not yet formed, provide a business history form for each Offeror-Guarantor.

The information provided below is for the entity: _____

(1) Has Offeror ever defaulted from or been terminated from a management or concession contract, or been forbidden from contracting by a public agency or private company?

☐ YES ☐NO

If YES, provide full details of the circumstances.

(2) List any Bankruptcies, Receiverships, Foreclosures, Transfers in Lieu of Foreclosure, and/or Work-Out/Loan Modification Transactions during the past five years. (If none, then so indicate). Include an explanation of the circumstances, including nature of the event, date, type of debt (e.g., secured or unsecured loan), type of security (if applicable), approximate amount of debt, name of lender, resolution, bankruptcy plan, and/or other documentation as appropriate.

(3) Describe any pending litigation or administrative proceeding (other than those covered adequately by insurance) which, if adversely resolved, could materially impact the financial position of the Offeror. (If none, then so indicate).

(4) Describe any lawsuit, administrative proceeding or bankruptcy case within the past five years that concerned the Offeror's alleged inability or unwillingness to meet its financial obligations. (If none, then so indicate).

(5) Describe any liens recorded against the Offeror within the past five years (whether from taxing authorities or judgments) and, if resolved, provide a copy of any lien release. (If none, then so indicate).

I hereby certify, under penalty of perjury, that the information provided in this Business History Information Form is accurate and complete.

Offeror's Name (or Offeror-Guarantor's Name)

By: _____

Printed Name: _____

Title of Authorized Officer (if applicable): _____

Prospectus (Proposal Package at Page 15)(emphasis added).

37.     The Prospectus also stated that offerors could request a debriefing from NPS:

**Availability of a Debriefing**

Offerors may request in writing either a pre- or post-award debriefing after receiving the Notification of Selection/Non-Selection letter. A pre-award debriefing occurs after the selection of the best proposal that was timely submitted and responsive, but before award of the concession contract. Award of a concession contract does not occur until the competitive process has been completed and both the selected Offeror and the Service have signed the concession contract (36 C.F.R. Part 51). If Offerors wish to request a debriefing, a written request for either a pre- or post-award debriefing must be received within 14 calendar days from receiving the Notification of Selection/Non-Selection letter. The Service will make every effort to debrief Offerors as soon as practicable after receiving a request. Circumstances may cause a pre-award debriefing to be delayed until after the contract award. If a pre-award debriefing is delayed until after contract award, the Service will provide a post-award debriefing. A debriefing is not an opportunity for negotiation, amendment, supplementation or reevaluation of any proposal.

Prospectus (Proposal Instructions at Page 3).

38.     On December 12, 2014, the deadline stated by NPS for submission of proposals, National

Mall Tours Tour delivered its proposal to NPS in response to the Prospectus.

15

39.    The applicable regulations prohibited an offeror from amending or supplementing its proposal after December 12, 2014 without the permission of NPS and only if the amendment was due to a general failure by all offerors to understand a particular prospectus requirement or a general failure by all offerors to submit certain required information.  36 C.F.R. § 51.15(b).

40.    NPS did not provide permission for any offeror to amend or supplement its proposal after December 12, 2014.

41.    The intended awardee's prior contract to provide the services at issue ended on December 31, 2014.  Prospectus (Business Opportunity at Page 9).

42.    NPS stated in the Prospectus that NPS "expects to extend the Existing Temporary Contract to expire on March 31, 2015."  Prospectus (Business Opportunity at Page 9).

43.    However, the law prohibited NPS from extending a temporary concession contract.  36 C.F.R. § 51.24(a) (Sept. 29, 2014) ("A temporary concession contract may not be extended").

44.    Therefore, NPS was required to issue a new temporary contract to authorize the intended awardee to continue operations past December 31, 2014.  36 C.F.R. § 51.24(a) (Sept. 29, 2014) (NPS "may non-competitively award a temporary concession contract or contracts for consecutive terms not to exceed three years in the aggregate").

45.    If NPS intended to issue a temporary contract, NPS was required by law to issue a notice in the Federal Register of any new temporary contract "at least 30 days in advance of its award (except in emergency situations)."  36 C.F.R. § 51.24(a).

46.    NPS did not issue any such notice, as otherwise required by law, to authorize the intended awardee's operations after December 31, 2014.

47.    The intended awardee, however, continued operations after December 31, 2014.

48.     Because NPS was aware, for many months, of the impending end of the intended

awardee's temporary contract, NPS cannot legitimately claim that circumstances of the

impending end of that temporary contract as of December 31, 2014 somehow constituted an

emergency situation.

49.     NPS therefore failed to comply with the law when it allowing the intended awardee to

continue performing concession services after December 31, 2014.

50.     On or about February 24, 2015, the intended awardee was purchased by Exponent Private

Equity LLP, a partnership incorporated and located in Great Britain.

51.     National Mall Tours is unaware of why the intended awardee would agree to be taken

over by a new owner in the midst of its efforts to obtain a federal contract.

52.     On or around March 17, 2015, a representative of NPS contacted National Mall Tours by

telephone and informally indicated that NPS had selected the intended awardee, which NPS

referred to as "Big Bus Tours," for award of the concession contract at issue.

53.     On March 17, 2015, National Mall Tours sent an email to NPS requesting a pre-award

debriefing from NPS in the upcoming days.

54.     NPS stated that it would provide National Mall Tours with its requested debriefing.

55.     On March 25, 2015, counsel for National Mall Tours contacted NPS regarding the status

of its requests and NPS stated that it had not awarded the contract.  Counsel for National Mall

Tours then sent an email to NPS stating that, pursuant to 16 U.S.C. § 5952(6) and based on the

historical revenues for services substantially similar to those authorized by the new contract,

NPS had a statutory obligation to submit the draft concession contract to the Committee on

Resources for the House of Representatives and the Committee on Energy and Natural

Resources for the Senate.

17

56.     By letter dated March 26, 2015, National Mall Tours further informed NPS that, on

February 24, 2015, the intended awardee had reportedly been purchased by a new foreign-owned

company, Exponent Private Equity LLP, and that any decision by NPS to proceed with an award

to that entity based on its prior proposal was arbitrary and contrary to law given the change in

that entity's controlling ownership.

57.     In that same letter, National Mall Tours informed NPS that Exponent Private Equity LLP

states on its website that, when it acquires a company, its goal is to "transform" the company

under its ownership by, among other things, designating a new management team.  *See*

*http://www.exponentpe.com/about-us/our-investment-strategy.aspx* (Exponent Private Equity

LLP takes over companies that it believes it can "transform" by selecting new "management

teams" for that entity).  Thus, Exponent Private Equity LLP demonstrated that it will not be a

silent owner of the intended awardee and will likely use its new controlling interest to change the

current management team for that entity.

58.     NPS had the legal authority to take this additional information into consideration before

making a final decision to award the contract.  NPS explicitly stated in the Prospectus that:

> In making its selection of the best proposal submitted in response to the
> Prospectus, the Service has the right, but not the obligation, to consider any other
> information relating to the matter.

Prospectus (Proposal Instructions at Page 5, ¶ 11(l)).

59.     Given this critical change in the status of its intended awardee, NPS had the authority and

obligation to cancel the solicitation at this point in time pursuant to 36 C.F.R. § 51.11 (Sept. 29,

2014), which states:

**§ 51.11   May the Director amend, extend, or cancel a prospectus or
solicitation?**

The Director may amend a prospectus and/or extend the submission date prior to the proposal due date. <u>The Director may cancel a solicitation at any time prior to award of the concession contract if the Director determines in his discretion that this action is appropriate in the public interest</u>. No offeror or other person will obtain compensable or other legal rights as a result of an amended, extended, canceled or resolicited solicitation for a concession contract.

(Emphasis added.)[3]

60.     This right was reiterated in the Prospectus (Proposal Instructions at Page 4, ¶ 11(b)):

The Service may amend a Prospectus or extend the submission date, or both, prior to and on the proposal due date. The Service also may cancel a solicitation at any time before the award of the concession contract if the Service determines in its discretion that this action is appropriate in the public interest.

61.     On March 26, 2014, NPS responded to National Mall Tours' letter and prior email, stating that it would review the information and respond "as soon as possible."

62.     On March 31, 2015, National Mall Tours received a letter from NPS in which NPS formally informed National Mall Tours that NPS had selected City Sightseeing Washington D.C., dba Big Bus Tours, for the concession contract.

63.     On April 1, 2015, counsel for National Mall Tours sent an email to NPS following up on National Mall Tours' earlier correspondence and inquiring about the current status of the contract award process.

64.     On April 3, 2015, NPS responded, stating that NPS had gone ahead and signed the contract.  NPS had not provided any debriefing at this point.  NPS then stated that, because it believed the matter had "potential for litigation," all further communications should be with NPS's attorneys.

---

[3] Pursuant to the regulation at 36 C.F.R. § 51.11 (Sept. 29, 2014), NPS does not have the authority to amend a prospectus after the due date for proposals.

65.     NPS never denied National Mall Tours' assertions in its March 25 and 26 letters nor did NPS state that the intended awardee's proposal contained information regarding its new owner which had allowed NPS to properly evaluate its proposal.

## COUNT I

66.     National Mall Tours repeats and re-alleges the allegations in paragraphs 1-65 as if set forth fully herein.

67.     The concession contract at issue will result in the concessioner receiving and being responsible for approximately $85,000,000.

68.     The Prospectus required each offeror, by submitting the Offeror's Transmittal Letter, to make critical certifications regarding any past criminal conduct or conduct involving fraud by the offeror and any owners of the offeror.

69.     The Prospectus stated that these certifications were required pursuant to 2 C.F.R. Part 1400.

70.     Pursuant to 2 C.F.R. §§ 1400.10 and 180.125(a), these certifications are required "to protect the public interest" so that "the Federal Government [can] ensure[] the integrity of Federal programs by conducting business only with responsible persons."

71.     The Prospectus demonstrated that these certifications were material to the evaluation process, stating that the absence of a valid, signed Offeror's Transmittal Letter which includes these certifications "will make your proposal non-responsive."  Prospectus (Proposal Instructions at Page 1).

72.     Pursuant to the terms of the Prospectus, these certifications had to be made on behalf of both the offeror and any owners of the offeror.

73.     The intended awardee's proposal contained certifications set out in its Offeror's Transmittal Letter which were made prior to the intended awardee being purchased by a new foreign-owned corporation.

74.     Therefore, at the time NPS made a determination as to the award of the concession contract at issue, the intended awardee's certifications regarding any past criminal conduct or conduct involving fraud were not valid.

75.     NPS was aware, at the time it was making a determination as to the award of the concession contract, that the intended awardee's certifications were not valid.

76.     NPS proceeded to award the concession contract at issue to the intended awardee, even though NPS was aware that the intended awardee's certifications regarding any past criminal conduct or conduct involving fraud by it or its owner were no longer valid because the certifications were made before the offeror was acquired by its new owner.

77.     In addition, by proceeding with the award process when it was aware that the intended awardee's certifications were now invalid, NPS in effect waived the intended awardee's obligation to provide these required certifications prior to being awarded the contract.

78.     NPS had no legal obligation to proceed with the award of the contract under the Prospectus and had the authority, pursuant to 36 C.F.R. § 51.11, to cancel the Prospectus at any point in time prior to making a final award.

79.     NPS failed to invoke this authority to cancel the Prospectus, even though it was aware that the intended awardee's certifications regarding any past criminal conduct or conduct involving fraud as to its owners were no longer valid because the certifications were made prior to the change in ownership.

21

80.     NPS's decision to move forward and award the concession contract at issue even though it was aware that the intended offeror's certifications were no longer valid was not consistent with the terms of the Prospectus, arbitrary, capricious, and abuse of discretion and not in accordance with law.

81.     In addition, NPS's failure to comply with the laws applicable to the award of the concession contract at issue resulted in the contract being void ab initio.

## COUNT II

82.     National Mall Tours repeats and re-alleges the allegations in paragraphs 1-81 as if set forth fully herein.

83.     Pursuant to Principal Selection Factor 3 set out in the Prospectus, all offerors were required to provide specific information regarding any entities having a controlling interest in the offeror.  Prospectus (Proposal Package at Page 7).

84.     After the intended awardee submitted its proposal, it was purchased by a new foreign-owned entity which resulted in a change in the intended awardee's controlling interest.

85.     The intended awardee failed to provide this specific information with regard to its current controlling owner.

86.     NPS was aware, prior to the time it awarded the contract at issue, that the intended awardee had not provided this specific information as to the entities which held a controlling interest in the intended awardee as of the date NPS would award the contract.

87.     Any change in the controlling interest of an entity operating as an authorized concessioner is of material importance to NPS, as demonstrated by the fact that it required this information to be included in the proposal and that NPS prohibits any concessioner from selling

its controlling interest without the explicit approval of NPS.  That prohibition is set out at 51

C.F.R. § 51.85, which states in relevant part:

> The concessioner may not assign, sell, convey, grant, contract for, or otherwise transfer (such transactions collectively referred to as "assignments" for purposes of this part), without the prior written approval of the Director, any of the following:
>
> []      (c) Any controlling interest in a concessioner or concession contract. . . .

88.      Because it lacked this critical information as to the entity with a controlling interest in the

intended awardee, NPS's decision to proceed with the award of the contract to the intended

awardee was not consistent with the terms of the Prospectus, arbitrary, capricious, an abuse of

discretion and not in accordance with the law.

89.      In addition, NPS's failure to comply with the laws applicable to the award of the

concession contract at issue resulted in the contract being void ab initio.

## COUNT III

90.      National Mall Tours repeats and re-alleges the allegations in paragraphs 1-89 as if set

forth fully herein.

91.      Pursuant to Subfactor 4(a) of Principal Selection Factor 4 set out in the Prospectus, each

offeror was required to complete a Business History Information Form so that NPS could

properly evaluate the qualifications of the offeror.  Prospectus (Proposal Package at Pages 12,

15).

92.      To ensure that NPS properly evaluated the offeror, the Business History Information

Form required each offeror to certify that any entity with a controlling interest in the offeror had

not defaulted from or been terminated from a management or concession contract or been

forbidden from contracting by a public agency or private company. *Id*.[4]

93.     In the event any entity with a controlling interest in the offeror had been defaulted,

terminated or forbidden from contracting by a public agency or private company, the offeror was

required to provide full details of that event. *Id*.

94.     The Business History Information Form also required each offeror to list any

bankruptcies, receiverships, foreclosures, transfers in lieu of foreclosure, and/or work-

out/loan modification transactions during the past five years for any entity having a

controlling interest in the offeror. *Id*.

95.     In the event any entity having a controlling interest in the offeror was involved in

any of the listed events, the offeror was required to include an explanation of the

circumstances, including nature of the event, date, type of debt (*e.g.*, secured or

unsecured loan), type of security (if applicable), approximate amount of debt, name of

lender, resolution, bankruptcy plan, and/or other documentation as appropriate. *Id*.

96.     The Business History Information Form also required each offeror to list any

pending litigation or administrative proceeding (other than those covered adequately by

insurance) regarding any entity which held a controlling interest in the offeror which, if

adversely resolved, could materially impact the financial position of the offeror. *Id*.

---

[4] NPS has asserted in other challenges to its evaluation of concession proposals that information
similar to that at issue is not material to its evaluation, but that claim has been rejected by the
courts. *See Eco Tour Adventures, Inc. v. United States*, 114 Fed. Cl. 6, 33 (2013)("Here again,
the court must agree with [plaintiff] that the NPS failed to provide a rational basis for its
determination that the errors and omissions in [the intended awardee's] financial information
were immaterial").

97.     The Business History Information Form also required each offeror to describe any lawsuit, administrative proceeding or bankruptcy case within the past five years that concerned the alleged inability or unwillingness of any entity having a controlling interest in the offeror to meet its financial obligations.  *Id*.

98.     The Business History Information Form also required each offeror to describe any liens recorded against any entity having a controlling interest in the offeror within the past five years (whether from taxing authorities or judgments) and, if resolved, to provide a copy of any lien release.  *Id*.

99.      The intended awardee failed to provide this specific information with regard to its current controlling owner.

100.    NPS was aware, prior to the time it awarded the contract at issue, that the intended awardee had not provided this specific information as to its controlling owner as of the date NPS would award the contract.

101.    Because it lacked this critical information as to the controlling owner of the intended awardee, NPS's decision to proceed with the award of the contract to the intended awardee was not consistent with the terms of the Prospectus, arbitrary, capricious, an abuse of discretion and not in accordance with the law.

102.    In addition, NPS's failure to comply with the laws applicable to the award of the concession contract at issue resulted in the contract being void ab initio.

**COUNT IV**

103.    National Mall Tours repeats and re-alleges the allegations in paragraphs 1-102 as if set forth fully herein.

104.    The National Park Service Concessions Management Improvement Act of 1998, at 16 U.S.C. § 5952(6), requires the National Park Service to submit any proposed concession contract with anticipated annual gross receipts in excess of $5,000,000 to the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.  The Act further states that NPS is prohibited from awarding any such proposed contract until at least 60 days after it provides notification to both committees.  *Id*.

105.    The concession contract at issue authorizes substantially the same operations as occurred under a prior contract which resulted in annual gross revenues of $8,100,000 in the last full year of that contract which had been reported as of the date NPS prepared the Prospectus (May 2012- April 2013).

106.    In addition, National Mall Tours estimated in its proposal that the annual gross revenues under the new concession contract would be $8,500,000.

107.    Upon information and belief, the intended awardee also estimated in its proposal that the annual gross revenues under the new concession contract would be well in excess of $8,000,000.

108.    However, notwithstanding these facts, NPS alleged that it somehow estimated that the new concession contract would have less than $5,000,000 in gross annual revenues in its first year.

109.    NPS provided no analysis or details regarding its estimate.  NPS stated that it did not set out its analysis in the Prospectus because it did not have confidence in its estimate and did not want any parties to rely upon it.

110.    Inconsistently, NPS also asserted that its estimate *was* sufficient for NPS to have confidence that the results of that estimate justified NPS not submitting the draft contract to the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate pursuant to 16 U.S.C. § 5952(6).

111.    NPS's alleged estimate that the annual gross revenues for the first year of the new concession contract would be less than $5,000,000, which was nearly half of the historical revenues for substantially similar operations, was arbitrary, capricious and an abuse of discretion.

112.    Accordingly, NPS's failure to comply with 16 U.S.C. § 5952(6) by submitting the draft contract to the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate was arbitrary, capricious, an abuse of discretion and not in accordance with law.


**PRAYER FOR RELIEF**

WHEREFORE, National Mall Tours of Washington, Inc., respectfully requests that this Court:

(a)    issue an order declaring that the National Park Service's decision to proceed with the award of the concession contract at issue was contrary to the terms of the Prospectus, arbitrary, capricious, an abuse of discretion and not in accordance with the law;

(b)    issue an order declaring that the National Park Service's award of the concession contract at issue was void ab initio;

(c)    issue an injunction directing NPS to cancel the Prospectus and re-solicit proposals pursuant to a new Prospectus or, in the alternative, submit the

27

proposed contract to the Committee on Natural Resources of the House of

Representatives and the Committee on Energy and Natural Resources of

the Senate for a 60-day review pursuant to 16 U.S.C. § 5952(6);

(d)      grant National Mall Tours its costs and attorneys' fees incurred in

pursuing this action; and

(e)      grant National Mall Tours such further relief as this Court deems just and

proper.

Respectfully submitted,

 /s/ Kevin R. Garden
Kevin R. Garden
DC Bar No. 426745
The Garden Law Firm, P.C.
901 N. Pitt Street
Suite 325
Alexandria, VA 22314
kevin@gardenlawfirm.com
Tel.:  (703) 535-5565
Fac.: (703) 997-1330

Counsel for Plaintiff
National Mall Tours of Washington, Inc.

Dated:  April 10, 2015