# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ——————————————————————  ) | |
| NATIONAL MALL TOURS ) | |
| OF WASHINGTON, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 15-0529 (ABJ) |
| ) | **UNDER SEAL** |
| UNITED STATES DEPARTMENT ) | |
| OF THE INTERIOR, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ——————————————————————  ) | |

## MEMORANDUM OPINION

Plaintiff National Mall Tours of Washington, Inc. ("National Mall Tours") has brought this

action against the United States Department of the Interior, Secretary of the Interior Sally Jewell,

the National Park Service ("Park Service"), and Director of the Park Service Jonathan Jarvis,

challenging the Park Service's award of a concession contract for guided bus tour services in

Washington, D.C.  Compl. [Dkt. # 1].  Plaintiff alleges that there was a change in the controlling

interest of the awardee, City Sightseeing Washington D.C., Inc., d/b/a Big Bus Tours ("Big Bus

Tours"), after the proposals had been submitted but before the award was finalized.  *Id.* ¶ 2.

According to plaintiff, this rendered the Big Bus Tours proposal invalid, and since the Park Service

failed to give adequate consideration to the change, the award to Big Bus Tours was improper.  *Id.*

¶ 3.  Plaintiff also asserts that the Park Service failed to comply with its statutory obligation to

submit a contract with anticipated gross receipts over $5 million to Congress for a period of sixty

days before awarding the contract. *Id.* ¶ 4. Plaintiff asks the Court to declare the contract award invalid and to direct the Park Service to redo the solicitation. *Id.*, Prayer for Relief, at 27–28.[1]

Plaintiff endeavors to create the impression that there has been a recent, nefarious foreign takeover of the tour operator for the nation's capital. It contends that the Park Service failed to give due consideration to this change in ownership, which in plaintiff's view, should have barred Big Bus Tours from receiving the contract. Compl. ¶¶ 2–3 (asserting that Big Bus Tours "had been purchased by a foreign-owned corporation . . . and therefore its controlling interest had changed," and that the Park Service "had the legal authority to review this change in ownership . . . but failed to do so"); *id.* ¶ 50 ("[T]he intended awardee was purchased by Exponent Private Equity."); *id.* ¶ 51 ("National Mall Tours is unaware of why the intended awardee would agree to be taken over by a new owner."). But that is simply not what took place. Throughout the entire contract award process, Big Bus Tours was a wholly-owned subsidiary of Open Top Sightseeing USA ("Open Top Sightseeing"), a U.S. company, which has always been a wholly-owned subsidiary of Big Bus Tours Limited, a U.K. company. So what this case turned out to be about is whether the award should be invalidated because between the time Big Bus Tours submitted its proposal and the time the Park Service reached its decision, a U.K. private equity firm acquired an ownership stake in Big Bus Tours Limited, the U.K.-owned grandparent company of Big Bus Tours, or because the Park Service failed to submit the contract to Congress and wait sixty days before awarding it.

---

1   In its motion for summary judgment, plaintiff also asks the Court to "issue an injunction directing the National Park Service to select [plaintiff] for award of the concession contract at issue," or, in the alternative, to remand the matter to the agency for a new solicitation. Pl.'s Mot. for Summ. J. on the Admin. R. & Mem. in Supp. [Dkt. # 31] ("Pl.'s Mot.") at 1. But the request to be deemed the successful bidder does not appear in the complaint, and the Court need not address the availability of this extraordinary remedy since the award to Big Bus Tours will stand.

This case is not only marred by a gap between the facts and the rhetoric; it is also a case in search of a theory. While plaintiff has advanced different legal theories in its complaint, its motion for summary judgment, and at oral argument, it has yet to supply the Court with any legal basis for overturning the contract award under the APA. Because the Court finds that the certifications made by Big Bus Tours in its proposal concerning its ownership were not invalidated by the change in the grandparent company's ownership, and because the Park Service properly considered this information in any event, it will not invalidate the award on that basis. The Court also finds that it was not unreasonable for the Park Service to determine that it could only anticipate annual gross receipts based on the services required under the contract, and that the anticipated amount was below the threshold at which Congressional notification was required. Therefore, plaintiff's motion for summary judgment will be denied, and defendant's cross-motion for summary judgment will be granted.

## BACKGROUND

### I.    Factual Background

This case arises out of a National Park Service solicitation for a ten-year concession contract to provide "interpretive transportation services" – guided bus tours – for visitors to the National Mall and other landmarks in Washington, D.C. Administrative Record ("AR")[2] 3105–559 ("Prospectus"). These services had been previously provided by Big Bus Tours under a

---

2       The Administrative Record in this matter was filed under seal in twenty-five parts on June 11, 2015. *See* Defs.' Notice to File Amended AR Under Seal & Attachs. [Dkt. # 27]. After the Court observed that the Administrative Record was incomplete and missing a number of documents referenced in the parties' pleadings, *see* Min. Order (Oct. 19, 2015), defendants filed an eleven-part supplement. *See* Def.'s Notice of Filing & Attachs. [Dkt. # 52]. Each page of the Administrative Record is stamped with a Bates number in the bottom right corner with the prefix "1:15-cv-00529-ABJ00" and a four-digit number. This Memorandum Opinion will utilize the four-digit numbers when citing to the pages of the Administrative Record.

contract that was due to expire on March 31, 2015.  AR 1041; AR 3136.  The Park Service issued

the Prospectus for the new contract on October 23, 2014, and it called for all proposals to be

submitted by December 12, 2014.  AR 3107.

      The Prospectus set forth five statutorily-mandated Principal Selection Factors upon which

proposals would be evaluated:

> Principal Selection Factor 1.  The responsiveness of the proposal to the objectives, as described in the Prospectus, of protecting, conserving, and preserving resources of the park[;]

> Principal Selection Factor 2.  The responsiveness of the proposal to the objectives, as described in the Prospectus, of providing necessary and appropriate visitor services at reasonable rates;

> Principal Selection Factor 3.  The experience and related background of the Offeror, including the past performance and expertise of the Offeror in providing the same or similar visitor services as those to be provided under the new concession contract;

> Principal Selection Factor 4.  The financial capability of the Offeror to carry out its proposal; and

> Principal Selection Factor 5.   The amount of the proposed minimum franchise fee and other forms of financial consideration to the Service. . . .

AR 3113; *see also* 54 U.S.C. § 101913(5)(A); 36 C.F.R. § 51.17(a).  The Prospectus also identified

a Secondary Selection Factor:  "[t]he quality of the Offeror's proposal to conduct its operations in

a manner that furthers the protection, conservation, and preservation of the park and other

resources through environmental management programs and activities, including, without

limitation, energy conservation, waste reduction, and recycling."  AR 3113; *see also* 54 U.S.C.

§ 101913(5)(B); 36 C.F.R. § 51.17(b).  Finally, the Prospectus required any offeror to submit a

transmittal letter certifying that the information provided in its proposal was "complete, true, and

correct," including any representations regarding "individuals or entities acting as Offeror or with

an ownership interest in the Offeror."  AR 3118.

4

The Prospectus noted that "[c]oncession contracts issued for a term of more than ten years, or when the annual gross receipts are anticipated to exceed $5,000,000, are required by law to be submitted to the Congress for sixty days before they may be awarded." AR 3114. Because the Park Service determined that the contract at issue did not meet those requirements, it advised offerors that "[t]he new concession contract will not be submitted to the Congress." AR 3114.

Three companies submitted proposals in response to the Prospectus: Big Bus Tours, City Sights DC, and National Mall Tours, the plaintiff in this action. AR 1037–230 (Big Bus Tours); AR 1292–379 (City Sights DC); AR 1380–767 (National Mall Tours). In response to Principal Selection Factor 3, Big Bus Tours, the eventual awardee, stated that it "is fully responsible for all aspects of operations" in Washington, D.C., "including Vehicle Maintenance and Operations, Sales & Marketing, Finance, Training, Safety, and Human Resources." AR 1063.[3] It also explained that Big Bus Tours "is a wholly owned subsidiary of Open Top Sightseeing USA, which in turn is a wholly owned subsidiary of Big Bus Tours Limited," based in London. AR 1061. It characterized Big Bus Tours Limited as "a major international company, operating on three continents," and it further clarified that "[n]o individual or Entity owns greater than 25% of Big

---

3       In describing its "Operational Experience," Big Bus Tours also highlighted its role as the previous Park Service concessioner providing guided bus tours around the National Mall:

> The operation in Washington DC has been offering tours of the capital since 2007, carrying more than 2.4 million visitors in that time. Big Bus Washington DC maintains a fleet in excess of 30 vehicles and has offices based in the heart of DC with a full service depot and repair facility located in Hyattsville MD, only 10 miles from our main terminal at Union Station. Big Bus has been the official and exclusive concessionaire of the National Park [S]ervice since 2012. . . . Our senior Management team in Washington DC has over 40 years' experience with the company and over 60 in the hospitality, transportation, and tour business.

AR 1062.

Bus Tours Ltd." AR 1059. Big Bus Tours also included a business organization form for itself and for Open Top Sightseeing, and it stated that "[h]igh level management support of the local operation" and "[f]unding, as needed," is provided by both Open Top Sightseeing and Big Bus Tours Limited. AR 1060–61.

From December 15, 2014 through December 19, 2014, and again on January 21, 2015, a Park Service evaluation panel convened to review the three proposals based on the criteria set forth in the Prospectus. AR 1775–814.[4] The panel "consisted of one voting chair, eight voting [Park] Service employees, and three technical advisors from the Park, the Region and a contractor." AR 1776. Based on the five Principal Selection Factors and the Secondary Selection Factor, the panel gave Big Bus Tours the highest score of 20.0 points, with City Sights DC and National Mall Tours receiving 17.0 and 16.5 points, respectively. AR 1777. The panel ultimately recommended that the Big Bus Tours proposal be found responsive and that Big Bus Tours receive the contract. AR 1815. On February 16, 2015, Steve LeBel, the Park Service's Deputy Associate Regional Director, transmitted this recommendation to Robert Vogel, the Park Service's Regional Director, who approved it on March 15, 2015. AR 1816. On March 23, 2015, the Park Service sent Big Bus Tours a letter indicating that on March 16, 2015, two copies of the concession contract had been provided to Rich Goldstein, the company's General Manager, for his signature. AR 3059.

On March 19, 2015, plaintiff's CEO contacted Deputy Associate Regional Director LeBel by email and asked whether he was aware that, as he put it, "Big Bus was sold in February of this

---

4       The version of the panel's evaluation that was made a part of the Administrative Record in this case appears to be a draft. It bears the date "January 2015" in strikethrough, and that date was revised to March 2015. It also includes various tracked changes and comments. Plaintiff states that "[c]ounsel for defendants represented that the redlined changes in this copy of the Panel Evaluation Summary were accepted and the resulting document was sent to the Regional Director as the final evaluation." Mem. in Supp. of Pl.'s Mot. [Dkt. # 31] ("Pl.'s Mem.") at 13 n.7. The Court will treat this draft version as reflecting the final conclusions of the evaluation panel.

year."  AR 3046.  On March 26, 2015, plaintiff's counsel sent a more-detailed letter to LeBel, asserting that "as of February 2015, Exponent Private Equity LLP, a foreign entity, took over control of Big Bus Tours."  AR 3560–62 ("Garden Letter").[5]  Since the proposals had been submitted in December 2014 and the acquisition did not occur until February 2015, plaintiff's lawyer opined that Big Bus Tours could not have included information about the acquisition in its submission and it could not have been reviewed by the panel.  Garden Letter, AR 3561–62.  He advanced plaintiff's position that the Park Service was "legally precluded from proceeding with any award of the contract at issue to Big Bus Tours," since the evaluation panel had not properly considered this new information.  Garden Letter, AR 3561–62.

That same day, LeBel forwarded the letter to Debra Hecox, the Park Service's Branch Chief for Planning and Development, and they discussed the implications of the potential ownership change.  AR 3069.  On March 27, 2015, Liz Tinker, a Park Service Concessions Management Specialist, contacted Big Bus Tours and requested that it "resubmit" the portions of its contract proposal addressing Principal Selection Factors 3 and 4 "with the new ownership information," and that it "provide a narrative or a revised proposal signifying all the references of the previous ownership replaced by the new ownership."  AR 3086.

Big Bus Tours responded the next day, representing that "[o]n March 19, 2015 Exponent Private Equity made an investment in Big Bus Ltd.," and that this change "in no way affects the tender submitted with no change in control or ownership structure of [its] US operations."  AR

---

5       When the parties supplemented the Administrative Record, some of the supplemental documents appear to have been stamped with overlapping Bates numbers.  In other words, there are two sets of documents bearing the same Bates range of AR 3560–79.  The March 26, 2015 letter from plaintiff's counsel and its attachments are part of the second set of documents.  To avoid any confusion, the Court will refer to this particular document as the "Garden Letter," and it will also provide the Bates number appearing on the bottom right of the relevant page(s).

1845.  Big Bus Tours stated that the change had no effect on Principal Selection Factors 3 and 4, and it explained that the Big Bus Tours corporate structure remained the same as it had been described in the contract proposal:  "City Sightseeing Washington DC, Inc. dba Big Bus Washington DC remains a wholly owned subsidiary of Open Top Sightseeing USA, which in turn is a wholly owned subsidiary of Big Bus Tours Limited."  AR 1845–46.  It added that "Big Bus Tours Limited is beneficially owned by Exponent Private Equity Partners III LP."  AR 1846. Finally, it represented that there was no change in the offeror's "financial capacity to carry out our proposal as submitted" or in the "Investment, Income and Cash Flow schedules as originally supplied" in response to the Prospectus.  AR 1846.

On March 30, 2015, Tinker reviewed the response and informed Hecox and other Park Service staff that she saw nothing in the letter "that changes the organizational structure or the offeror guarantor."  AR 3088.  Hecox instructed Tinker to proceed with obtaining the Regional Director's signature on the Big Bus Tours contract, AR 3088, and the final signed contract was transmitted to Big Bus Tours later that day.  AR 3090; *see also* AR 1847–902 (final signed contract).

## II.    Procedural History

Plaintiff initiated this action on April 10, 2015, Compl., and three days later, it moved for a preliminary injunction, asking the Court to order the Park Service to suspend operations under the newly-awarded contract.  Pl.'s Mot. for Prelim. Inj. [Dkt. # 4].  On April 15, 2015, the parties filed a joint stipulation advising the Court that, in response to plaintiff's concerns that it might be prejudiced by further operations by Big Bus Tours under the contested contract, the Park Service had suggested to Big Bus Tours that it "not make any significant investments related to its

contractual operations until the pending motion for a preliminary injunction is resolved." Joint Stipulation & Proposed Briefing Schedule [Dkt. # 13] at 1.

At a status conference held on April 16, 2015, the Court consolidated plaintiff's motion for a preliminary injunction with the merits pursuant to Federal Rule of Civil Procedure 65, and it established a schedule for the submission of cross-motions for summary judgment. Min. Entry (Apr. 16, 2015); Min. Order (Apr. 17, 2015). One month later, Big Bus Tours moved to intervene in this action, Mot. & Mem. of P. & A. in Supp. of Mot. to Intervene [Dkt. # 19], and the Court granted its request. Min. Order (May 18, 2015).

On July 16, 2015, plaintiff filed its motion for summary judgment. Pl.'s Mot. for Summ. J. on the Admin. R. & Mem. in Supp. [Dkt. # 31] ("Pl.'s Mot."); Mem. in Supp. of Pl.'s Mot. [Dkt. # 31] ("Pl.'s Mem."). Defendants filed a combined opposition and cross-motion on August 18, 2015. Defs.' Opp. to Pl.'s Mot. & Cross-Mot. for Summ. J. [Dkt. # 37] ("Defs.' Mot."). Plaintiff filed its reply and cross-opposition on September 8, 2015, Pl.'s Opp. to Defs.' Mot. & Pl.'s Reply to Defs.' Opp. & Mem. in Supp. [Dkt. # 41] ("Pl.'s Reply"), and defendants filed their cross-reply on September 14, 2015. Defs.' Cross-Reply [Dkt. # 47]. Also on September 8, 2015, Big Bus Tours filed its sealed opposition to plaintiff's motion, Def.-Intervenor's Mem. in Opp. to Pl.'s Mot. [Dkt. # 43] ("Intervenor's Opp."), and plaintiff replied to that pleading on September 15, 2015. Pl.'s Reply to Intervenor's Opp. [Dkt. # 49]. The Court held a hearing on the motions on February 4, 2016. Min. Entry (Feb. 4, 2016); *see also* Draft Tr. of Hr'g, *Nat'l Mall Tours of Wash., Inc. v. U.S. Dep't of Interior*, No. 15-0529 (D.D.C. argued Feb. 4, 2016) ("Draft Hr'g Tr.").

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of agency action under the APA, Rule 56 does not apply due to the limited role of a court in reviewing the administrative record. *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011). Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law." *Id.* § 706(2)(D).

"The court's role in reviewing agency contract decisions is limited to determining whether the agency acted in accord with applicable statutes and regulations and had a rational basis for its decisions." *LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham*, 347 F.3d 315, 320 (D.C. Cir. 2003), quoting *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984). "As with other agency cases, [the] review is limited to the administrative record, and the agency is entitled to a presumption of regularity." *Id.* (citations omitted). "[C]ourts will not make contracts for agencies, for the ultimate grant of a contract must be left to the discretion of the agency, 'unless it is clear that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to order the award.'" *Id.*, quoting *Delta Data*, 744 F.2d at 204. "Consequently, the disappointed bidder seeking to overturn the agency's decision must show either that the agency's decision lacked a rational basis or that the 'procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.'" *Id.*, quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973).

## ANALYSIS

Plaintiff's complaint consists of four counts, each alleging that the Park Service acted arbitrarily and capriciously or in violation of the law in awarding the contract to Big Bus Tours.

10

In Count I, plaintiff contends that the certifications made by Big Bus Tours in its Offeror's Transmittal Letter concerning "any past criminal conduct or conduct involving fraud by the offeror and any owners of the offeror" were invalidated by the Exponent transaction, and that the Park Service failed to invoke its authority to cancel the Prospectus when it became aware that the certifications were no longer accurate.  Compl. ¶¶ 68–81.  In Count II, plaintiff alleges that the information Big Bus Tours provided in response to Principal Selection Factor 3 of the Prospectus regarding entities with a controlling interest in the offeror was also invalidated by Exponent's acquisition of an interest in Big Bus Tours Limited, and that this too rendered the award invalid because the Park Service failed to consider the material change in ownership.  *Id.* ¶¶ 83–89.  In Count III, plaintiff contends that Big Bus Tours provided inaccurate responses to Principal Selection Factor 4 regarding business history, and therefore, the award of the contract by the Park Service was unlawful.  *Id.* ¶¶ 91–102.  And in Count IV, plaintiff alleges that the Park Service acted unreasonably when it determined that the annual gross revenues for the first year of the new contract would not exceed $5 million, the statutory threshold at which the agency was required to submit the contract to Congress for a sixty-day notification period, and that its failure to submit the contract and let the two-month period go by invalidates the award.  *Id.* ¶¶ 104–12.

At the hearing, plaintiff's counsel stated that plaintiff has abandoned the claim in Count I. Draft Hr'g Tr. 33:15–34:4.[6]  As for Counts II and III, the Court finds that there was no failure by the Park Service to consider information material to the Prospectus because there was no change in the controlling interest of the offeror – Big Bus Tours.  Therefore, the decision to award the contract to Big Bus Tours was not invalid.[7]  Further, considering Count IV, the Court concludes that the agency's determination that Congressional notification was not required was reasonable. So, it will deny plaintiff's motion for summary judgment, and it will grant summary judgment in defendants' favor.

---

[6]  

> The Court:  And the Park Service has the authority to cancel the procurement.  But the regulations say the director may, at any time, if he determines in his discretion that the action is appropriate.  How can you find in there that I could find that the failure to do that is unlawful, given the extremely broad discretion that's been afforded to him.
>
> Mr. Garden:  First of all, in our brief we explain that when we became aware of the administrative record, we don't think it was appropriate to cancel. But focusing on that issue, if there wasn't?
>
> The Court:  Wait.  You're done with Count 1?  You've withdrawn Count 1?
>
> Mr. Garden:  Yes, Your Honor.  We believe that the solicitation should not be canceled.

Draft Hr'g Tr. 33:15–34:4; *see also* Pl.'s Mem. at 44 ("[The Park Service] has no reasonable basis to cancel the Prospectus which would also unnecessarily result in additional agency costs.").

[7]  For this reason, the Court will not reach plaintiff's argument that the Park Service also could not properly have awarded the contract to the other bidder, City Sights DC, and that the Court must therefore direct the agency to award the contract to plaintiff.  *See* Pl.'s Mem. at 43–45 ("Because both Big Bus Tours' and City Sights DC's proposals were ineligible for award, the only remaining offeror who is eligible for award is National Mall Tours.").  The Court notes that this does not appear to be a remedy it has the authority to award, given the case law on a court's limited role in reviewing the award of government contracts, and it also does not appear to be a request that was ever presented in the complaint, but it need not resolve that issue.

I.       **Exponent's acquisition of a stake in Big Bus Tours Limited did not result in a change in the "controlling interest" in Big Bus Tours.**

The thrust of plaintiff's case on summary judgment is that the Park Service's award of the concession contract to Big Bus Tours was invalid because there was a change in the controlling interest in Big Bus Tours, the offeror, and this claimed change rendered the proposal invalid and the offeror ineligible for the award.  Counts II and III of the complaint attack the award based on purported inaccuracies in the responses to Principal Selection Factors 3 and 4 in the Big Bus Tours proposal.  Compl. ¶¶ 83–102.

Plaintiff argues in its memorandum that the award of the contract to Big Bus Tours was invalid because the identity of any entity which held an ownership or controlling interest in an offeror was material to the evaluation criteria set forth in the Prospectus.  Pl.'s Mem. at 19–24. According to plaintiff, there was a change in controlling interest after Big Bus Tours submitted its proposal, and it rendered the proposal inaccurate and invalid *ab initio*.  *Id.*  But the ownership in Big Bus Tours never changed:  it was, and remains, a wholly-owned subsidiary of Open Top Sightseeing, which in turn was, and still is, a wholly-owned subsidiary of Big Bus Tours Limited. *Compare* AR 1059 (Big Bus Tours' December 2014 proposal showing Big Bus Tours' organizational structure), *with* AR 1846 (Big Bus Tours' March 28, 2015 letter to the Park Service showing identical organizational structure).  And the fact that the grandparent company, Big Bus Tours Limited, was a foreign entity was set forth clearly in the original proposal.  *See* AR 1059– 63.

At oral argument, plaintiff's counsel was unable to offer any legal authority for the proposition that the mere fact of the change in ownership nullified the proposal.  *See* Draft Hr'g Tr. 21:13–24:11.  Plaintiff continues to maintain that the change in ownership at the Big Bus Tours Limited level constituted a change in the controlling interest of the offeror, and it argues that the

proposal was unlawfully amended.  But neither the applicable regulations nor the terms of the Prospectus support the conclusion that there was a material change or an amendment to the Big Bus Tours proposal.

### A.    The Regulations

The first problem with plaintiff's argument is that it can point to no law that would authorize the Court to invalidate an award based upon a proposal that was accurate at the time it was submitted, and no one in the courtroom at the hearing could identify any statute or regulation governing the impact of a change in circumstances – even assuming it was material – during the pendency of the solicitation.  *See, e.g.*, Draft Hr'g Tr. 8:20–24, 23:9–24:11.[8]  The closest plaintiff has been able to come is the set of regulations pertaining to existing concessioners – in particular, the regulations governing when a concessioner may transfer its interest in an ongoing concession contract or in the concessioner itself.  *See* Pl.'s Mem. at 20–24, citing 36 C.F.R. §§ 51.85, 51.87, 51.88.

---

8      In fact, counsel for defendants expressly disavowed that there is any duty to update a proposal after it had been submitted, even if there had been a material change in circumstances:

> The Court:  But, here, as in a typical government contract situation, the offeror has to certif[y] that the information in its proposal is true and accurate at the time it is submitted.  Assuming they have to do that, which they did in this case, is there some obligation to update it if there is a change?

> Mr. Shoaibi:  The answer is no. . . .

> The Court:  Even if there's a material change, the only thing that matters is was [the proposal] true the day you gave it to us?

> Mr. Shoaibi:  In terms of an obligation to supplement, that is correct.

Draft Hr'g Tr. 6:14–7:2.

36 C.F.R. § 51.85, provides:

> The concessioner may not assign, sell, convey, grant, contract for, or otherwise transfer . . . without the prior written approval of the Director, any of the following:
>
> > (a) Any concession contract; [or] . . .
> >
> > (c) Any controlling interest in a concessioner or concession contract . . . .

36 C.F.R. § 51.85.  The regulations further state:

> A controlling interest in a concessioner means, in the case of corporate concessioners, an interest, beneficial or otherwise, of sufficient outstanding voting securities or capital of the concessioner or related entities that permits the exercise of managerial authority over the actions and operations of the concessioner.  A "controlling interest" in a concessioner also means, in the case of corporate concessioners, an interest, beneficial or otherwise, of sufficient outstanding voting securities or capital of the concessioner or related entities to permit the election of a majority of the Board of Directors of the concessioner.

*Id.* § 51.84.

Plaintiff's reliance on these regulations is misplaced.  First, they apply only to a concessioner – defined as "an individual, corporation, or other legally recognized entity that duly holds a concession contract."  36 C.F.R. § 51.3.  Therefore, they do not on their face place any restrictions on an offeror awaiting the outcome of a solicitation.[9]  And to the extent that they provide some guidance by analogy, each of the regulations speaks in terms of the concessioner itself and a controlling interest *in the concessioner*, not a controlling interest in a parent corporation, much less the parent of a parent.  They do not purport to address, and the Court does

---

9       For that reason, insofar as plaintiff seeks to argue that Big Bus Tours violated the regulations prohibiting a transfer of interest without Park Service approval and that this violation rendered its proposal invalid, *see* Pl.'s Reply at 6, that argument fails.

not read them to encompass, restrictions on a transfer of interest in a parent or grandparent of a concessioner.[10]

The D.C. Circuit has discussed these regulations, albeit in dicta, and its observations are consistent with the Court's reading of the language here.  In *Amfac Resorts v. U.S. Dep't of Interior*, 282 F.3d 818 (D.C. Cir. 2002), *vacated in part on other grounds sub nom. Nat'l Park Hosp. Ass'n v. U.S. Dep't of Interior*, 538 U.S. 803 (2003), several concessioners challenged a number of Park Service regulations, including 36 C.F.R. § 51.85, on the grounds that "the regulations – as [the concessioners] read them – require Park Service approval of transactions undertaken by the concessioners' shareholders or their affiliates," and not just those undertaken by the concessioner itself.  *Id.* at 836–37 (internal quotation marks omitted).  Observing that many Park Service concessioners are corporations and that "almost all of the largest concessioners are 'wholly owned subsidiaries of larger corporations,'" *id.* at 837, quoting 65 Fed. Reg. 20,630, 20,661 (Apr. 17, 2000), the D.C. Circuit noted that "[w]hat worries the concessioners is that transactions by the parent could potentially require Park Service approval if a change in control would result."  *Id.*

But, the Court of Appeals concluded, "the regulations do not read that way."  *Id.*  The Court continued:

> The critical provision is 36 C.F.R. § 51.8[5].[11]  It speaks only of sales, assignments, conveyances and so forth by the "concessioner."  The term "concessioner," in regulatory parlance, "is an individual, corporation, or

---

10     The other regulations upon which plaintiff relies, *see* Pl.'s Mem. at 21, citing 36 C.F.R. §§ 51.87, 51.88, all build upon the same definition of controlling interest, and are therefore similarly unpersuasive.

11     The *Amfac Resorts* opinion refers at this point to 36 C.F.R. § 51.8, but that section deals with when and how the Park Service Director will publish the notice of the availability of a prospectus, and it does not make mention of any of the terms discussed in the opinion.  Thus, based on context, the Court concludes that the D.C. Circuit instead intended to refer to 36 C.F.R. § 51.85.

> other legally recognized entity that duly holds a concession contract," 36
> C.F.R. § 51.3 – a definition that at least on its face encompasses only the
> subsidiary corporation, not the parent. It therefore appears that if the parent
> corporation engages in a sale-of-control transaction, this would not require
> approval because the concessioner – the subsidiary corporation – would not
> be doing the selling.

*Id.* While the D.C. Circuit ultimately did not rule on the validity of the regulations because it determined that the matter was not yet ripe, *id.* at 837–38, the Court at least indicated that the prohibition on transfers of controlling interest in section 51.85 applied only to the concessioner itself, and not to its parent corporation, or – as here – its grandparent corporation.

The *Amfac Resorts* analysis may be dicta, and the Court recognizes that the case was overturned on other grounds. But other than to maintain that the D.C. Circuit simply got it wrong, *see* Draft Hr'g Tr. 31:2–3 ("Their dicta is wrong because it guts the purpose of the rule."), plaintiff offers no support for how the Court could find the agency's approach to be an unreasonable abuse of discretion and a violation of law that is entitled to no deference when it is consistent with the only statement made by the D.C. Circuit on this issue.[12]

Plaintiff points to the fact that the definition of "controlling interest" in 36 C.F.R. § 51.84 includes an interest in the concessioner or "related entities." Pl.'s Reply at 2, citing 36 C.F.R. § 51.84 ("A controlling interest in a concessioner means . . . an interest . . . of sufficient outstanding voting securities or capital of the concessioner or related entities that permits the

---

[12] The Court's reading of the regulations is also consistent with an analogous provision of the Federal Acquisition Regulation ("FAR") relating to the applicability of novation agreements. That regulation "prohibits transfer of Government contracts from the contractor to a third party," unless the Government agrees to recognize the third party as the successor in interest to the contract pursuant to a novation agreement. 48 C.F.R. § 42.1204(a). However, the regulation further provides that "[a] novation agreement is unnecessary when there is a change in the ownership of a contractor as a result of a stock purchase, with no legal change in the contracting party, and when that contracting party remains in control of the assets and is the party performing the contract." *Id.* § 42.1204(b). In other words, where, as here, the contracting party does not change and it remains in control of the contract performance, no government approval is necessary.

exercise of managerial authority over the actions and operations of the concessioner."). Based in part on this provision, it argues that Exponent's acquisition of an interest in Big Bus Tours Limited effected a change in the controlling interest in Big Bus Tours itself. Pl.'s Reply at 3.

But in order for an interest in a concessioner to qualify as "controlling" under section 51.84, it must be an interest that "permits the exercise of managerial authority over the actions and operations of the concessioner." 36 C.F.R. § 51.84. Plaintiff posits that Exponent's acquisition of a controlling interest in Big Bus Tours Limited "gave it the ability to exercise managerial authority over the actions and operations of Big Bus Tours," Pl.'s Mem. at 16, but there is no support in the record for this claim, and in fact, it is contradicted by the statement in the Big Bus Tours proposal that the contract would be managed and performed exclusively by Big Bus Tours in Washington, D.C. *See, e.g.*, AR 1063 ("The company in Washington DC is fully responsible for all aspects of operations, including Vehicle Maintenance and Operations, Sales & Marketing, Finance, Training, Safety, and Human Resources."); *see also* Aff. of Richard Goldstein in Supp. of Intervenor's Opp. [Dkt. # 43-1] ¶ 8 ("Exponent's investment has not changed the management or operating responsibilities of Big Bus or its parent companies. The individuals identified in the proposal as responsible for daily operations, including oversight and responsibility for performing the National Park Service Mall Transportation Services contract, continue in these positions.").

Plaintiff also notes that Exponent has stated publicly that its goal when it acquires a new company "is to 'transform' the company under its ownership by, among other things, designating a new management team." Pl's Mem. at 15, citing Garden Letter, AR 3561 (quoting from Exponent's website). It also asserts that "it is standard for private equity firms such as Exponent Private Equity to charge a management fee to a company which they have acquired," which plaintiff speculates could have an impact on Big Bus Tours Limited's finances. *Id.* at 17. But this

is pure conjecture, and in any event, the fact that Exponent might take certain actions with regard to Big Bus Tours Limited says nothing about whether Exponent would be able to exercise "managerial authority over the actions and operations" of Big Bus Tours itself in a way that would influence its performance of the contract.  *See* 36 C.F.R. § 51.84.

Finally, plaintiff asserts that the immediate parent corporation, Open Top Sightseeing, is "a non-operational shell holding company."  *See* Pl.'s Reply at 4; *see also* AR 1070 (Big Bus Tours' proposal stating that Open Top Sightseeing is a "non-operational entit[y]").  But even if that were true, it would not change the Court's analysis.  Plaintiffs still cannot show that when Exponent acquired an interest in Big Bus Tours Limited, it also obtained a controlling interest in the U.S. tour operator, sufficient to permit it to exert control or authority over operations under the concession contract.

For those reasons, even if one assumes that the regulations governing a change in a controlling interest of a "concessioner" have some bearing on the evaluation of a pending proposal, there has been no such change in this case.  Exponent's acquisition of an ownership interest in Big Bus Tours Limited did not constitute a change in a controlling interest, as that term is defined in the regulations, of Big Bus Tours itself.

### B.    The Prospectus

Plaintiff also cites the Prospectus in support of its assertion that Exponent's acquisition of an interest in Big Bus Tours Limited effected a change in control of the offeror.  *See* Pl.'s Mem. at 4–5, 20–22.  This argument fails for the same reason, because like the regulations, the Prospectus speaks only in terms of the offeror itself, and it is not concerned with ownership transactions several steps removed from the entity that will be performing the contract.  The Court finds that the answers to questions about ownership and controlling interest in the Big Bus Tours proposal

were not rendered inaccurate or otherwise invalidated by Exponent's acquisition of an interest in the grandparent company.

### 1.      Principal Selection Factor 3

In Count II, plaintiff points to Principal Selection Factor 3, which required all offerors "to provide specific information regarding any entities having a controlling interest in the offeror." Compl. ¶¶ 83–89.  Plaintiff maintains that the decision to proceed with the award was invalid because the Park Service "was aware, prior to the time it awarded the contract at issue, that the intended awardee had not provided this specific information as to the entities which held a controlling interest in the intended awardee." *Id.* ¶¶ 86, 88–89.

Principal Selection Factor 3 asked offerors to "[i]dentify any individual or business entity that holds or will hold a controlling interest in the Offeror," including "all levels of parent organizations, their relationship to the Offeror, and the precise extent of their ownership interests." AR 3124.  In its proposal, Big Bus Tours provided an organizational chart showing that Big Bus Tours Limited owned Open Top Sightseeing, which in turn owned Big Bus Tours, and it represented that "[n]o individual or Entity owns greater than 25% of Big Bus Tours Ltd."  AR 1059.  While that statement was accurate when made, the information changed after Exponent acquired an interest in Big Bus Tours Limited.  AR 1846 (Big Bus Tours March 28, 2015 letter to the Park Service representing that "Big Bus Tours Limited is beneficially owned by Exponent Private Equity Partners III LP," and that "[n]o one individual investor holds an interest which is equal to or greater than 20% in Exponent Private Equity.").  So plaintiff is correct that at least one statement in the Big Bus Tours proposal became inaccurate after the proposal had been submitted.

But the Prospectus makes clear that "[t]his organizational structure information will not be scored for selection purposes," AR 3124, and so a change to the information provided in response

20

to that section of Principal Selection Factor 3 can hardly be considered to be material to the Park Service's evaluation of responsive proposals. *See* AR 3111 ("Information 'required by the Prospectus' refers to information expressly required by the Prospectus and that is material, as determined by the Service, to an effective evaluation of the proposal under the applicable selection factor."). And in any event, as discussed above, Exponent's acquisition of a controlling stake in Big Bus Tours Limited did not change the information that had been provided about who held a controlling interest *in the offeror*.

The Prospectus also asked each offeror to complete a Business Organization Information form for "the Offeror and each business entity and/or individual to be involved in the management of the proposed concession operation." AR 3124; *see also* AR 3127–28. It requested "[t]he name, address and, if applicable, form of business entity of all related, subordinate, or superior business organizations and/or individuals that will have a significant role in managing, directing, operating, or otherwise carrying out the services to be provided by the Offeror." AR 3124. In response, Big Bus Tours completed Business Organization Information forms for itself and for Open Top Sightseeing, showing that Big Bus Tours was 100-percent owned by Open Top Sightseeing, and that Open Top Sightseeing was 100-percent owned by Big Bus Tours Limited. AR 1060–61. These forms were also not scored for selection purposes. AR 3124. And nothing about the responses on the forms was affected or otherwise invalidated by the Exponent acquisition. So the Business Organization Information forms do not provide a basis to find that Big Bus Tours failed to provide, or that the Park Service failed to consider, information material to the Prospectus prior to the contract award.

A review of the remainder of Principal Selection Factor 3 and the Big Bus Tours responses reveals that not one of the scored responses would have changed based on the Exponent

transaction.  Subfactor 3(a) asked the offeror to "[d]emonstrate [its] experience in the operation and management of interpretive transportation services," and subfactor 3(b) sought information on the offeror's "key personnel responsible for managing every day operations."  AR 3125.  Neither subfactor sought, and Big Bus Tours did not provide, information on parent entities.  AR 0162–67.  Subfactor 3(c) requested information on any violations or infractions committed by the offeror and "all parent entities, subsidiaries or related entities . . . that provide the same or similar services as required or authorized by the Draft Contract."  AR 3126.  Exponent, as a private equity firm, does not provide "the same or similar services" as those required or authorized by the contract – that is, interpretive transportation services – and it does not provide any other transportation services either, so it would not have constituted a related entity about which information should have been provided in response to subfactor 3(c).

So, the Court concludes that there was no change in any material information provided by Big Bus Tours in response to Principal Selection Factor 3 that would have invalidated its proposal or otherwise precluded the Park Service from awarding it the contract.[13]

---

13      For these reasons, to the extent that plaintiff attacks the contract award by questioning the validity of the certifications contained in the Big Bus Tours Offeror Transmittal Letter, see Pl.'s Reply at 19–20, that challenge also fails.  As part of that letter, Big Bus Tours was required to certify that "[n]one of the individuals or entities acting as Offeror or with an ownership interest in the Offeror" was prohibited from transacting with a federal department or agency, had been charged with or convicted of certain offenses relating to fraud, or had a government transaction terminated for cause or default within the last three years.  AR 3118–19.  Defendants state that the Park Service "takes the position in practice" that the term "ownership interest" "applies only to entities with a direct ownership interest, and does not apply to indirect ownership such as ownership by virtue of owning a parent corporation's parent corporation."  Defs.' Mot. at 14.  This position is consistent with the plain meaning of the regulations governing Park Service concession contracts and the terms of the Prospectus, all of which speak only in terms of the offeror itself, and the Court finds it to be reasonable.

### 2.      Principal Selection Factor 4

Plaintiff also alleges that the responses to Principal Selection Factor 4 in the Big Bus Tours proposal were rendered invalid by the Exponent transaction, and that the Park Service failed to consider this material information in proceeding with the award to Big Bus Tours.  Compl. ¶¶ 91–102.  But in its summary judgment pleadings, plaintiff discusses this factor only when it points to alleged deficiencies in the proposal submitted by City Sights DC, the second-place bidder.  *See* Pl.'s Mem. at 10–13, 36–39.  Presumably, these arguments were advanced to support plaintiff's claim that if Big Bus Tours were to be declared ineligible, plaintiff should receive the award, notwithstanding the fact that the panel rated plaintiff at the bottom of the three offerors.  AR 1777.  But if Count III was intended to challenge the award to Big Bus Tours based on Principal Selection Factor 4, that claim fails.

That is because Principal Selection Factor 4 also is clearly concerned only with the offeror itself.  Its title is "the Financial Capability of the Offeror to Carry Out Its Proposal," AR 3129, and each of the subfactors seeks information on the financial history and abilities of the offeror:

> Subfactor 4(a).  Demonstrate that you have a credible, proven track record of meeting your financial obligations.  The Offeror (or each Offeror-Guarantor) must provide comprehensive materials to demonstrate that it has a history of meeting its financial obligations . . . .
> \* \* \*
> Subfactor 4(b).  Demonstrate the Offeror's business experience and financial capacity . . . .
> \* \* \*
> Subfactor 4(c).  Demonstrate that your proposal is financially viable and that you understand the financial obligations of the Draft Contract . . . .
> \* \* \*
> Subfactor 4(d).  Demonstrate your ability to obtain the required funds for start-up costs under the Draft Contract by providing credible, compelling documentation, particularly evidence from independent sources, such as bank statements, audited or reviewed financial statements, and signed loan commitment letters.

23

AR 3129–31.  In other words, this selection factor did not call for any information about the financial capabilities and obligations of any entity with an ownership interest in the grandparent of the offeror.  And so, the Court finds that there was no change to any information made material by Principal Selection Factor 4 that would have invalidated the Big Bus Tours proposal.

The Court notes that in response to Principal Selection Factor 4, Big Bus Tours did provide financial and credit information for itself and for Big Bus Tours Limited.  AR 1077–81, 1084–89.  But just because Big Bus Tours provided this information does not mean that it was required to do so by the terms of the Prospectus, or that the information was necessarily material to the Park Service's evaluation of the offer.  More important, this information concerned the financial capabilities of Big Bus Tours Limited itself, and not any individuals or entities that had an ownership stake in it at that time.  And in any event, it does not appear that the responses to any of the Principal Selection Factor 4 subfactors would have been affected by Exponent's acquisition of an ownership stake in Big Bus Tours Limited.  That is true even for the Business History Information Form, which requests business history information "for the Offeror AND all parent companies."  AR 3132.  That form was filled out only for Big Bus Tours itself, and there is no indication that any of the responses on that form would have been different as a result of the change in ownership of Big Bus Tours Limited.

For those reasons, the Court finds that there was no change in any material information required by the regulations or the Prospectus, and that Big Bus Tours' proposal was not rendered inaccurate or otherwise invalid by the fact that Exponent acquired an ownership interest in Big Bus Tours Limited during the award process.  Thus, there are no grounds to invalidate the award on this basis.

**II.    The contract award was not invalidated by the Park Service soliciting, and Big Bus Tours providing, additional information on Exponent's acquisition of an ownership interest in Big Bus Tours Limited.**

In its summary judgment briefing, plaintiff contends that the Park Service "illegally" requested that Big Bus Tours "amend its proposal" to reflect Exponent's newly-acquired ownership interest, and that this amendment invalidated the contract award.  Pl.'s Mem. at 24–27.  Specifically, plaintiff asserts that 36 C.F.R. § 51.15(a) prohibited the Park Service from seeking the additional information ultimately provided by Big Bus Tours.  *Id.* at 25.  This claim does not appear in the complaint, and it does not provide a basis for relief.

Section 51.15(a) provides:

> The Director may request from any offeror who has submitted a timely proposal a written clarification of its proposal.  Clarification refers to making clear any ambiguities that may have been contained in a proposal but does not include amendment or supplementation of a proposal.  An offeror may not amend or supplement a proposal after the submission date unless requested by the Director to do so and the Director provides all offerors that submitted proposals a similar opportunity to amend or supplement their proposals.  Permitted amendments must be limited to modifying particular aspects of proposals resulting from a general failure of offerors to understand particular requirements of a prospectus or a general failure of offerors to submit particular information required by a prospectus.

36 C.F.R. § 51.15(a).

Plaintiff insists that an offeror is absolutely barred from providing the Park Service with an update during the course of the award process, even if there is an unforeseen change in circumstances that causes a material representation in the offeror's proposal to become inaccurate.  In plaintiff's view, such a change in circumstances automatically and irreparably invalidates an offeror's proposal.  *See, e.g.*, Draft Hr'g Tr. 24:6–11 ("[T]he agency is saying offerors, you're put on notice that if you submit a bid to this agency for one of our concessions contract[s] and something changes and your proposal is no longer accurate, you're out of the running because you

25

can't amend it and we obviously can't give you a contract based on a prior situation when we know that's no longer the case."); *id.* 25:1–2 ("Basically you can't amend.  [The Park Service] stopped themselves from receiving any amendments.  That's their rule.").  But plaintiff offers no legal support for this rigid reading of the regulations, and the argument is at odds with plaintiff's equally adamant insistence that the information about the Exponent acquisition was absolutely critical to the Park Service's evaluation of the proposals.  In any event, because the Court has found that no material aspect of Big Bus Tours' proposal was rendered inaccurate by Exponent's acquisition of an ownership interest in Big Bus Tours Limited, it follows that there was no amendment to the Big Bus Tours proposal.

On March 19, 2015, plaintiff took it upon itself to inform the Park Service, inaccurately, that "Big Bus was sold in February."  AR 3046.  Plaintiff's counsel followed up with a letter on March 26, insisting that the solicitation was now invalid.  Garden Letter, AR 3560–62.  The Park Service immediately contacted Big Bus Tours on March 27, 2015, and asked it to "resubmit" Principal Selection Factors 3 and 4 "with the new ownership information," and "to provide a narrative or a revised proposal signifying all the references of the previous ownership replaced by the new ownership."  AR 3086.  The next day, Big Bus Tours responded to the Park Service's inquiry with a two-page letter, advising the agency that "Exponent Private Equity made an investment in Big Bus Ltd.," but that "in terms of [its] submission and specifically Primary Selection Factors 3 and 4 this change has no affect [sic]."  AR 1845.  In other words, the Park Service asked Big Bus Tours to verify that the information it submitted with regard to its ownership structure and certifications was still accurate, and Big Bus Tours responded that it was.  This does not qualify as an impermissible amendment based on a plain reading of the regulations; if anything, it appears to be a clarification.  *See* 36 C.F.R. § 51.15(a).

The Court finds that a similar provision of the Federal Acquisition Regulation ("FAR") sheds some light on this issue.  The FAR "distinguishes between two types of actions in the proposal evaluation process:  a 'clarification' on the one hand, and a 'negotiation' or 'discussion' on the other."  *Davis Boat Works, Inc. v. United States*, 111 Fed. Cl. 342, 353 (Fed. Cl. 2013). "The former is a 'limited exchange[ ], between the Government and [an] offeror[ ], that may occur when award without discussion is contemplated,' and which gives the offeror 'the opportunity to clarify certain aspects of proposals . . . or to resolve minor or clerical errors.'"  *Id.*, quoting 48 C.F.R. § 15.306(a)(1)–(2).  "In contrast, the FAR defines a 'negotiation' or 'discussion' as:  [an] exchange[ ] . . . between the Government and offerors, that [is] undertaken with the intent of allowing the offeror to revise its proposal."  *Id.*, quoting 48 C.F.R. § 15.306(d).

As the Court of Federal Claims observed in the *Davis Boat Works* case, "even '[i]f a response [to an agency's request for additional information] provides information essential to evaluation criteria, increases a past performance score[,] or tips the scales toward the offeror providing the clarification, it still may only be a clarification.'"  *Id.* at 353–54 (alterations in original), quoting *DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 542 (Fed. Cl. 2007).  The burden is on the party challenging a contract award to demonstrate that information provided by an offeror "constituted a substantive revision to its proposal."  *Id.* at 354.

Here, plaintiff cannot show that the information provided by Big Bus Tours in response to the agency's questions worked a substantive revision, and there is no indication that it altered the scoring that was already complete or tipped the scales in any way.  Even if the Court were to find that the Park Service's request sought an update on "information essential to evaluation criteria,"

*id.* at 353, what Big Bus Tours provided was more akin to a clarification that circumstances had not changed and that its proposal remained accurate and valid.[14]

The Court therefore concludes that there was no improper or illegal amendment of Big Bus Tours' proposal after it had been submitted.  And since there was no change to any information made material by the Prospectus or the regulations, the Park Service's decision to proceed with the award to Big Bus Tours was not arbitrary, capricious, an abuse of discretion, void *ab initio*, or otherwise not in accordance with law, and defendants are entitled to summary judgment on Counts II and III of the complaint.

### III.   The Park Service reasonably determined that the anticipated annual gross receipts for required services under the concession contract would not exceed the $5 million statutory threshold and that Congressional notification was therefore not required.

In Count IV, plaintiff alleges that the Park Service failed to comply with 54 U.S.C. § 101913(6), which requires the agency to submit any concession contract with anticipated annual gross receipts in excess of $5 million to Congress and await the expiration of a sixty-day notification period before awarding it.  Compl. ¶¶ 104–12; Pl.'s Mem. at 39–43.  It maintains that the Park Service's decision not to present the contract to Congress was arbitrary, capricious, an

---

14     If anything, the clarification the Park Service sought, and Big Bus Tours provided, was prompted by inaccurate information provided by plaintiff and plaintiff's counsel.  On March 19, 2015, plaintiff's CEO initiated communication with the Park Service by emailing Steve LeBel to announce, incorrectly:  "Are you aware that Big Bus was sold in February of this year?"  AR 3046. He added, "[d]o you know who you are dealing with at this point?"  AR 3046.  And on March 26, 2015, plaintiff's counsel contacted the Park Service and stated unequivocally that Big Bus Tours had been acquired by a new foreign company.  Garden Letter, AR 3561 ("[A]s of February 2015, Exponent Private Equity LLP, a foreign entity, took over control of Big Bus Tours.").  For the reasons discussed above, this is not the case:  Exponent acquired an ownership interest in Big Bus Tours *Limited*, not in Big Bus Tours itself, and the existence of a foreign parent was not a new circumstance.  The Park Service acted reasonably in inquiring whether such a change in control had in fact occurred, and Big Bus Tours did not provide any amendment to its proposal by responding that it had not.

abuse of discretion, and not in accordance with law, and that the award must be invalidated on that basis.  Compl. ¶¶ 111–12.

The Court has serious concerns about whether plaintiff has standing to challenge the agency's compliance with the Congressional notification provision, including whether plaintiff has sustained an injury in fact, whether that injury was caused by the agency's alleged failure to follow the statute, and whether any alleged injury would be redressed by requiring the Park Service to submit the contract to Congress.  But in any event, because it finds that the Park Service acted reasonably in interpreting the statute at issue, it will award defendants summary judgment on Count IV as well.

### A.  It is not clear that plaintiff has standing to challenge the Park Service's compliance with the Congressional notification provision.

"Standing can be raised at any point in a case proceeding and, as a jurisdictional matter, may be raised, *sua sponte*, by the court."  *Bauer v. Marmara*, 774 F.3d 1026, 1029 (D.C. Cir. 2014), quoting *Steffan v. Perry*, 41 F.3d 677, 697 n.20 (D.C. Cir. 1994).  To establish constitutional standing, a plaintiff must demonstrate:  (1) that he has suffered an "injury in fact"; (2) that the injury is "fairly traceable" to the challenged action of the defendant; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Lujan*, 504 U.S. at 561.

The injury in fact element requires a plaintiff to have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 560 (internal citations omitted), quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).  To be particularized, "the injury must affect the plaintiff in

a personal and individual way." *Id.* at 560 n.1. "[C]ausation, or traceability, examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 176 (D.C. Cir. 2012), quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc); *see also Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994) ("[F]air traceability turns on the causal nexus between the agency action and the asserted injury . . . .").

Here, there are serious issues with plaintiff's Article III standing to bring Count IV, in terms of injury in fact, causation, and redressability. Plaintiff maintains that its injury is "a loss of an opportunity by the plaintiff to fairly compete for a government contract," because it had a right to have the Park Service comply with the notification provision as "part of the process for a fair competition" in awarding the concession contract at issue. Draft Hr'g Tr. 48:3–5, 55:18–22. It insists that had the Park Service complied with the statute, plaintiff would have had "the ability . . . to petition Congress to take advantage of that 60-day review period to see if Congress had any interest in doing some[thing] with this award." *Id.* 54:13–16; *see also* Pl.'s Mem. at 43 n.21 ("Congress might preclude an improper award.").

But plaintiff's general interest in having the Park Service comply with the Congressional notification provision is not enough to demonstrate an injury in fact. *See Lujan*, 504 U.S. at 573–74 ("[A] plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy."). And while plaintiff is correct that a party can suffer "a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been

accorded the lost opportunity," *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015), quoting *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989), it is not clear that plaintiff actually suffered that sort of injury.  Plaintiff was not denied the opportunity to pursue the contract at issue in this case:  it submitted a proposal in response to the Prospectus, AR 1380–767, and the Park Service fully considered and evaluated its proposal before rejecting it.  AR 1775–814.  The Park Service's decision not to submit the winning contract to Congress, after the evaluation was complete and plaintiff came in third, had no effect on plaintiff's ability to pursue the benefit of the contract or to otherwise compete for the award.  Indeed, plaintiff was aware that the Park Service did not intend to submit the contract for which it was soliciting proposals before it chose to compete.  AR 3114.[15]

Moreover, to demonstrate standing, "plaintiffs must show 'more than the remote possibility . . . that their situation might . . . improve were the court to afford relief.'"   *Teton*

---

15      The Prospectus specifically advised offerors that "[t]he new concession contract will not be submitted to the Congress because annual gross receipts are not anticipated to exceed $5,000,000."  AR 3114.  Based on that statement, the Court questions whether plaintiff waived this aspect of its challenge to the Park Service's contracting decision.  The Federal Circuit has repeatedly held that "a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract."  *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012).  And the Prospectus warned offerors that, "[s]hould you believe any statement in the Prospectus to be inaccurate, you must submit comments to the Service in writing" before November 26, 2014.  AR 3107, 3114.  Despite representing in its proposal that it anticipated annual gross revenue of $8,580,000 for the first year of the contract, AR 1592, plaintiff did not alert the Park Service that it believed that the agency's statement concerning the applicability of the notification provision was incorrect.   In other words, plaintiff had the opportunity prior to the award to challenge the Park Service's decision not to submit the contract to Congress, but it chose not to do so.  The Court is not convinced that it should now be permitted to attack the award on this basis.  *See, e.g.*, *Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1314 (Fed. Cir. 2007) ("Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm."), quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 175 n.14 (Fed. Cl. 2005).  But because it finds that this aspect of plaintiff's complaint fails on the merits, it need not decide the waiver issue.

*Historic Aviation Found.*, 785 F.3d at 726, quoting *Warth v. Seldin*, 422 U.S. 490, 507 (1975). "[A] plaintiff does not have standing to sue when redress for its injury depends entirely on the occurrence of some other, future event made no more likely by its victory in court." *Id.* Here, plaintiff speculates that Congress might have done something or asked for some information in response to receiving the concession contract, and that Congress's potential interest might have changed the outcome of the contract award process in some unspecified way. *See, e.g.*, Pl.'s Mem. at 43 n.21 (speculating that "Congress might preclude an improper award"). But as plaintiff's counsel acknowledged at the hearing, in this case, plaintiff made sure that Congress was aware of the contract at issue, and Congress did ask the agency for more information, but it did not take any further action thereafter. Draft Hr'g Tr. 49:20–50:11 (explaining that plaintiff "spoke to Congress" about the contract, that Congress "asked the agency to provide them with copies of all the offerors' proposals," that the agency refused due to the ongoing litigation, and that the Congressional committee declined to take further action).

In other words, plaintiff had the chance "to petition Congress . . . to see if Congress had any interest in doing some[thing] with this award," *id.* 54:13–16, and Congress did nothing in response. There is thus no indication that plaintiff's purported interest in its right to compete for the contract would be vindicated in any way by ordering the agency to submit the contract to Congress, because there is nothing more than the remote possibility that Congress might take action. *See Teton Historic Aviation Found.*, 785 F.3d at 726. That is especially true in light of the fact that section 101913(6) is expressly entitled "Congressional notification," and not "Congressional approval," or even "Congressional review" – the statute does not provide for the legislature to take any action, and as the parties recognized at the hearing, Congress would have had to pass a law to avert the contract award in this case. *See* Draft Hr'g Tr. 11:22–25 ("The

32

notification is purely for notification purposes.  But if Congress wants to do anything, it still has

to take the additional step of passing legislation."); *id.* 45:22 ("[Congress] could pass a law.").  The

Court therefore finds that plaintiff has failed to show a substantial likelihood that its injury – the

purported denial of its opportunity to fairly compete for the contract – would be redressed by

requiring the agency to submit the contract to Congress. *Cf. Teton Historic Aviation Found.*, 785

F.3d at 726 (finding that the plaintiff put forth "evidence to show a substantial likelihood of

redress" where the agency's "past decisions and the incentives that will shape its choices in the

future" indicated that it was likely to resume selling aircraft parts to buyers, including the plaintiff,

if the agency's action was invalidated).

For those reasons, the Court doubts that plaintiff has standing to challenge the Park

Service's compliance with the Congressional notification provision.  But even assuming that

plaintiff has standing and this aspect of its case may proceed, the Court finds that the agency is

entitled to summary judgment on Count IV.

> **B.      The Park Service's determination that anticipated annual gross receipts under
> the contract would not exceed $5 million was reasonable.**

Plaintiff complains that the Park Service's estimate that anticipated annual gross receipts

under the new concession contract would not exceed $5 million was unreasonable, and that the

agency violated 54 U.S.C. § 101913(6) and acted arbitrarily and capriciously when it declined to

submit the contract to Congress for sixty days prior to awarding the contract to Big Bus Tours.

Compl. ¶¶ 104–12; Pl.'s Mem. at 39–43.

The provision upon which plaintiff relies is entitled "Congressional notification," and it

states:

> (A) In general.  The Secretary shall submit any proposed concession
> contract with anticipated annual gross receipts in excess of $5,000,000 or a
> duration of more than 10 years to the Committee on Natural Resources of

the House of Representatives and the Committee on Energy and Natural Resources of the Senate.

(B) Waiting period.  The Secretary shall not award any proposed concession contract to which subparagraph (A) applies until at least 60 days subsequent to the notification of both Committees.

54 U.S.C. § 101913(6).

In the Prospectus, the Park Service stated that the contract would "not be submitted to the Congress because annual gross receipts are not anticipated to exceed $5,000,000 and the term will not be for more than 10 years."  AR 3114.  To understand the Park Service's explanation for this decision, some background is required.

The Prospectus advised offerors that the concession contract would provide for two different types of services to be performed by a concessioner:  required and authorized services.  AR 3136; *see also* AR 1849 (final signed contract).  The "required visitor services" were described as "interpretive" and "multi-lingual interpretative visitor transportation services" covering "[a]pproximately nineteen stops within the National Mall, from the National Mall to Columbus Plaza at Union Station via the U.S. Capitol, Pennsylvania Ave. at the Willard Hotel, and to the transfer station at Arlington Cemetery."  AR 3136; AR 1849.  The Park Service referred to this route – the one beginning and terminating within the National Mall and Memorial Parks area – as the "Patriot Tour."  *See* AR 0715 (referring to "operations that are required by the concession contract to occur within NAMA" – the National Mall and Memorial Parks area – as "the 24 hour Patriot Tour.").  "Authorized visitor services," in contrast, were described as "extended tours" – "interpretive tours occurring within the National Mall and Memorial Parks as part of an extended tour that begins and ends outside the Park."  AR 3136; AR 1849.  The contract makes clear that "[t]he Concessioner *must* provide the . . . required Visitor Services," and that "[t]he Concessioner

34

is *authorized but not required* to provide" the authorized extended tour services.   AR 1849 (emphasis added).

Defendants explain that for purposes of section 101913(6), the Park Service "bases its estimates of anticipated gross receipts only on revenues from required services" – the Patriot Tour – and it excludes from this calculation revenues from "authorized services," because those services "are entirely optional at the choice of the concessioner, and the [Park Service] cannot guarantee that a new concessioner will undertake these services."   Def.'s Mot. at 4, citing AR 0712.   Using that approach, defendants argue, the Park Service reasonably concluded that the anticipated gross receipts under the contract – those earned from required services – would not exceed the statutory threshold.   *Id.* at 4–5, 19.

The Court's analysis of the Park Service's interpretation of section 101913(6) is governed by *Chevron U.S.A. Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984).  First, the Court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842.  Courts "use 'traditional tools of statutory construction' to determine whether Congress has unambiguously expressed its intent," *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319 (D.C. Cir. 1998), quoting *Chevron*, 467 U.S. at 843 n.9, including an examination of the statute's text, structure, purpose and legislative history.  *Bell Atlantic Tel. Co. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997).  If the Court concludes that the statute is either silent or ambiguous, the second step of the review process is to determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.

"[T]he precise question at issue" here is whether the agency was legally required to include revenue from optional services that were merely "authorized" under the contract in determining whether "anticipated annual gross receipts" would exceed the statutory threshold set in 54 U.S.C.

§ 101913(6).  The Concessions Act does not provide a definition for the relevant term, and the meaning of the phrase "annual gross receipts" is rendered somewhat unclear by the inclusion of the modifier "anticipated."  The Court could identify no legislative history that would shed any light on this issue, and the ordinary meaning of the word "anticipated" provides no guidance on this specific question, either.  Thus, the Court finds that the phrase "anticipated annual gross receipts" does not have "a plain and unambiguous meaning with regard to the particular dispute in this case."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).

Moving on to the second step of the *Chevron* analysis, the Court concludes that the Park Service's interpretation is "based on a permissible construction of the statute," and that it is therefore entitled to deference.  467 U.S. at 843.  Based on the statutory language, the Court cannot find that it was unreasonable for the Park Service to take the position that for purposes of the notification provision, the "anticipated annual gross receipts" from the "proposed concession contract" were the receipts derived from the services that were required to be provided *under that contract*, as opposed to the full spectrum of services that the awardee might choose at any point during the contract term to provide, or not provide, based upon its own independent business judgment.  The agency has no control over which authorized services, if any, a new concessioner might choose to offer.  *See* AR 1849.  Rather, "those [services] are completely contingent upon business conditions," as counsel for Big Bus Tours observed at the hearing.  Draft Hr'g Tr. 72:20– 21.  It was therefore reasonable for the Park Service to say that it could not "anticipate" receipts

from authorized services in valuing the contract for the purposes of the Congressional notification requirement.[16]

Having found that the Park Service's approach was consistent with the statute, the Court also concludes that there is sufficient support in the record for the agency's determination that receipts from required services would not exceed the notification threshold.  CHM Government Services ("CHM"), the outside consultant hired by the Park Service to conduct a financial and investment analysis to assist the Park Service in developing the new concession contract, *see* AR 0692, found that 2013 revenues for the required services – the Patriot Tour – totaled $3,608,105, and it estimated 2015 revenues of $3,706,000 for the same route.  AR 0625; AR 0715.  This estimate was affected by the Park Service's assumption of "a decreased volume of ridership . . . due to the arrival of the Circulator," a cheaper bus service alternative with routes around the National Mall.  AR 3146.  The Park Service "incorporated an estimate of a 12% decrease in ridership into its projections of anticipated gross receipts" as a result of expected competition from the Circulator.  Defs.' Mot. at 4; *see also* AR 0669 (Franchise Fee Analysis indicating -12% "demand variance").

Plaintiff challenges both the accuracy of the Park Service's gross receipts estimate and the adequacy of its explanation for its choice to rely only on revenues from required services in making that calculation.  Pl.'s Mem. at 39–43; Pl.'s Reply at 29–35.  It contends that the Park Service

---

16      The verb "anticipate" has a variety of definitions, but the relevant ordinary meanings of the word in this context are "to give advance thought, discussion, or treatment to," or "to look forward to as certain."  *Anticipate*, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/anticipate (last visited Mar. 16, 2016).  The Park Service appears to have adopted the latter definition in reaching its decision in this case.  "[W]here a statute's plain terms admit of two or more reasonable ordinary usages, the [agency's] choice of one of them is entitled to deference," *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 989 (2005), and the Court finds that deference to be warranted here.

ignored the evidence before it, including calculations provided by its own expert consultants and the estimates included in each of the three offerors' proposals, in concluding that annual gross receipts would not exceed the statutory threshold, and that it offered no justification or explanation for its decision to rely only on gross receipts from required services.  Pl.'s Mem. at 39–43. Essentially, plaintiff asserts that, for purposes of section 101913(6), "[i]t did not matter which minimum services the concessioner was 'required' to perform" – "[w]hat mattered was which services the concessioner was *likely* to perform."  *Id.* at 41 (emphasis in original).

But at bottom, plaintiff simply disagrees with the Park Service's approach:  it insists that it was likely that the concessioner would perform the authorized services, in addition to the required services, and the Park Service therefore should have included the revenue that was likely to be generated from those services in its section 101913(6) analysis.[17]  A court reviewing the matter *de novo* might find that it would have been appropriate under the statute to conclude that the anticipated annual gross receipts would exceed $5 million, particularly given the historic gross revenues of $8.1 million from required and authorized services in the previous year of the contract, AR 3136, and the estimates of the offerors in their proposals based on all planned services.  AR 3606 (Big Bus Tours' proposal estimating "total gross receipts" of $11.16 million for 2015); AR 3637 (plaintiff's proposal estimating "total gross receipts" of $8.58 million for 2015); AR 3623 (City Sights DC's proposal estimating "total gross receipts" of $8.08 million for 2015).  Certainly, the record indicates that the receipts that provide the basis for the concessioner's franchise fee –

---

17    For that reason, the cases plaintiff relies upon for the proposition that an agency acts arbitrarily and capriciously if it has offered an explanation for its action that runs counter to the evidence before it, *see* Pl.'s Mem. at 41–42, are unavailing.  The Park Service did not fail to consider or reject the evidence showing that the offerors might provide some of the authorized services; it just determined that it could not include revenue from those services in its section 101913(6) calculation of "anticipated annual gross receipts."

the required tours within the National Mall and those portions of the larger, authorized tours that crossed the Mall – were anticipated to exceed the statutory threshold.  AR 0735 (CHM Franchise Fee Calculation estimating total revenue of $7.5 million for 2015).

"But under *Chevron*, courts are bound to uphold an agency interpretation as long as it is reasonable – regardless whether there may be other reasonable, or even more reasonable, views." *Serono Labs.*, 158 F.3d at 1321.  And here, the Court has found that the agency's approach – basing its anticipated annual gross receipts estimate on expected revenue from required services – was reasonable and consistent with the statute, and so the Park Service's determination must be upheld.[18]

## CONCLUSION

Because Exponent Private Equity's acquisition of an ownership interest in the grandparent company, Big Bus Tours Limited, did not effect a change in the ownership or controlling interest in the offeror, Big Bus Tours, plaintiff's claim that the award was invalid on that basis fails.  And

---

18      Plaintiff also contends in its reply in support of its summary judgment motion that "[b]ecause the contract's anticipated annual revenues were well over $5,000,000, the award decision was not made by the authorized person and was therefore invalid." Pl.'s Reply at 35.  It insists that "the instant contract needed to be awarded by the Deputy Director for Operations or the Associate Director for Business Services," but that it instead was signed and awarded by the Regional Director, who lacked the authority to award a contract valued at more than $5,000,000. *Id.*; *see also* 36 C.F.R. § 51.22 (stating that award of "a concession contract with anticipated annual gross receipts in excess of $5,000,000 or of more than 10 years in duration . . . may not be made without the Director's written approval," and that "[t]he Director may not delegate this approval except to a Deputy Director or an Associate Director").

    This argument is not advanced in the complaint or even in plaintiff's motion for summary judgment, and so it is not properly before the Court.  *See, e.g.*, *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992) (stating that courts "generally refuse[ ] to entertain arguments raised for the first time in [a] reply brief").  And any argument plaintiff could advance to overcome the injury and causation hurdles to standing on this issue would be highly attenuated.  But the Court's conclusion that the Park Service acted reasonably in interpreting the phrase "anticipated annual gross receipts" disposes of this claim as well.

since the Court concludes that the Park Service's interpretation of the phrase "anticipated annual gross receipts" in 54 U.S.C. § 101913(6) was reasonable, it will not invalidate the award on the grounds that the agency failed to submit the contract to Congress and wait sixty days before awarding it.   Thus, it will deny plaintiff's motion for summary judgment, and it will grant defendant's cross-motion for summary judgment.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 18, 2016